EBERLE et ux., Respondents v. McKEOWN, Appellant

(159 N.W.2d 391)

(File No. 10444.  Opinion filed June 12, 1968)

346

**Cheever & Mydland,** Brookings, for defendant and appellant.

**McCann & Martin,** Brookings, for plaintiffs and respondents.

HOMEYER, Judge.

This is a suit brought by plaintiffs, Mary D. Eberle and Alfred M. Eberle, as lessors, to recover rents claimed to be due them under a farm lease, with the defendant, Wayne McKeown, as lessee, and for a termination of the lease. Upon trial to the court, judgment was entered in favor of plaintiffs for $5,145.13 of which $3,033.61 represented the balance of plaintiffs' share of corn, hay, and small grain for the year 1965. There is no dispute as to the latter amount. The remainder of the judgment, to wit, $1,950.82 represents unpaid balances from participation in federal agricultural programs found to be due plaintiffs for the years 1963 and 1964 and the full amount for the year 1965. Defendant concedes he owes $160.70 on the Eberle's share of the 1965 government payment. The court also found that McKeown had violated the terms of the lease and terminated the lease as of March 1, 1967. Defendant appeals.

The lease covers 629 1/2 acres known as the Eb-Dol farm near Brookings and is for a term of eight years beginning March 1, 1963. ·It is on a form prepared by the Economics Department of the Agricultural Experiment Station at South Dakota State University and is known as "South Dakota Improved Farm Lease". It purports to contain the main features of both cash rent and share-rent leases and is intended to give the landlord greater security of rent and property in exchange for greater freedom of operation by the tenant.

In brief it required the lessee to pay (1) as an annual rent for cropland on which crops are planted the cash value of 2/5 share of the annual average harvested yields for Brookings County based upon average monthly prices; (2) a like share computed the same way on alfalfa and hay land; (3) a stipulated cash rent for storage buildings and silo; (4) a 2/5 share of government payments on land retired or withheld from production. A preliminary rent payment was to be made on small grains and hay on October 1st and on row crops on December 1st of each year with final rental deferred until crop reports were published.

The primary dispute between the parties arises over the following provision in the lease: "2. Annual Rent for Government Controlled Land: The tenant agrees to pay as annual rent on land retired or withheld from production by governmental programs two fifths share or percent of any such governmental payment."

The Eb-Dol farm participated in the Feed Grain Program of the Agricultural Stabilization and Conservation Service for each of the years 1963, 1964 and 1965. The program is designed to control feed grain surpluses and to maintain and improve farm prices by limiting producing acres. Producers[1] of feed

---

1. A producer is defined as "a person who produces barley, corn or grain sorghums * * * as landowner, landlord, tenant or sharecropper, or would have produced one or more of these commodities if feed grains had been produced on the acreage diverted under the program." 1963 Feed Grain Program Regulation, § 775.202(o) Definitions, 28 Federal Register 4282, May 1, 1963. See also 1964-65 Feed Grain Program Regulations, § 775.304(c) (1) 29 Federal Register 590, January 24, 1964.

grains by diverting a certain minimum acreage[2] from production of barley, corn and grain sorghums to approved conservation uses, usually summer-fallow, are entitled to diverted acre and price support payments in variable amounts determined by a history of yields, price support allowances and loan rates. The Eb-Dol farm has a corn base of 228 acres and a barley base of 122 acres. Regulations permitted producers to choose to divert acreage from either barley or corn, or part from barley and part from corn, with payment rates based on kind or kinds of feed grain crops actually diverted.

In 1963 the parties diverted 70 acres of which 63.4 acres was from barley production and 6.6 acres from corn production. The minimum rate of $5.83 per acre or $369.62 was paid for land diverted from barley production and $8.44 per acre or $55.70 for corn land diverted. The total diverted acre payment in 1963 was $425.32.

In 1963 McKeown planted 46.8 acres of barley and 221.4 acres of corn, the latter being the balance of the corn base with the former slightly under the barley base. The program provides for price support payments on acres planted of each commodity. These are determined by multiplying historical yields with a per bushel rate fixed by the Secretary of Agriculture. In 1963 the barley yield was 31 bushels and the rate 14 cents per bushel resulting in a $4.34 per acre price support. The corn yield was 37 bushels and the rate was 18 cents per bushel or a price support of $6.66 per acre. Barley price support payments were $203.11 and corn payments $1,474.52 for a combined total of $1,677.63.

In 1964 diverted acre payments were $2,840.60 and price support payments $1,000.35.[3] In 1965, diverted acre payments were $401.77 and price support payments $2,199.04.[4]

---

2. Minimum diversion during the years in question was 20% of total feed grain base of 350 acres. Maximum diversion was 40% in 1963, and 50% in 1964 and 1965. Minimum acreages were diverted in 1963 and 1965 and maximum in 1964. Diversion payment rate was accelerated more than twofold when minimum exceeded.

3. In 1964, no barley was planted. On corn, 175.5 acres were planted and price support payment of $5.70 per acre was made. This was based on a yield of 38 bushels per acre multiplied by a 15 cent per bushel rate.

4. In 1965, 51 acres of barley were planted. The yield was 29 bushels per acre and the rate was 16 cents per bushel on barley. 223 acres of corn were planted. The yield was 44 bushels per acre and the rate was 20 cents per bushel.

McKeown contends the Eberles are only entitled to a 2/5 share of the diverted acre payments under the contract. The Eberles maintain and the court found they were entitled to a 2/5 share of all government payments including price support payments on acres planted during each of the years 1963, 1964 and 1965.

▮▮▮ A contract should be considered as a whole and all of its parts and provisions will be examined to determine the meaning of any part. The intention of the parties is to be ascertained from the entire instrument and not from detached portions. Bedell v. Steele, 71 S.D. 609, 28 N.W.2d 369; 17A C.J.S. Contracts § 297, 17 Am.Jur.2d, § 259. So considered, it is our opinion the Eberles were entitled to a 2/5 share of the price support payments under the terms of the lease.

Had the farm not been placed in the Feed Grain Program, the Eberles would have received a 2/5 share of the crop from each acre in the Eb-Dol farm. By participating a certain portion of such acreage was diverted from normal production and certain payments were made on those acres. In addition and as further compensation and incentive for the program the producers were entitled to additional payments on the acres which were actually planted. Price support payments depended upon diverting at least 20% of the feed grain base of the farm from production. Without such diversion, no price support payments would have been made. With diversion the return from acres planted was augmented. A unilateral sharing of such increase by the tenant would be contrary to the provisions of the contract considered as a whole for it is obvious that except for cash rent of buildings it required the tenant to pay as rent an agreed percentage of farm income subject to any benefit or detriment accruing to him by reason of use of average county yields and monthly prices.

McKeown so testified and other portions of the record reveal considerable flexibility and fluctuation in annual diverted acre payments. In some years payments were at reduced rates for minimum diversion and substantially larger if maximum or near maximum acres were diverted. In other years no pay-

ments were made for minimum diverted acres and no benefits accrued to producers except for price support payments and loan privileges. In the latter instance, to give the lease the effect for which McKeown contends would result in all government payments accruing to him and none to the Eberles under administrative regulations when 20% of the feed grain base was withheld from production.[5] This clearly was not intended by the lease.

We recognize that under the terms of the lease final rent is determined by using average yields in the county on crops planted and average monthly prices on such crops. This is of no significance since such prices do not include amounts paid under the feed grain program. The price support payments result from limiting the production of crops and should be shared as other income from cropland.

That the trial court was correct in reaching that conclusion as to the meaning of the lease does not require the affirmance of the judgment in toto. The McKeown answer included an affirmative defense that payments for the 1963 and 1964 crop years were made and accepted by plaintiffs as settlement in full and these were accords and satisfactions for these two years. It appears that without dispute that on July 27, 1964 when the final balances owed for rent were determined, McKeown issued his check to Eberles with a notation "final 1963 cash rent". On December 7, 1965 under similar circumstances he issued his check on which was written "1964 cash rent final". The 1963 rent check included only $170.12 and the 1964 rent check included $1,136.24 as the Eberle's share of the government payments. These were $671.06 and $400.14 less than the amount Eberles were entitled to under the lease which the trial court allowed and included in the judgment. The Eberles accepted the 1963 and 1964 checks, but refused the 1965 rent settlement check. We are of the opinion the trial court was in error in allowing recovery of the additional $671.06 and $400.14 due them under the lease for the years 1963 and 1964.

---

5. See 1966-69 Feed Grain Program Regulations, § 775.410(c). 31 Federal Register 115, June 15, 1966.

At common law where a claim or demand was liquidated payment or acceptance of a part did not discharge the balance and did not constitute a valid accord and satisfaction because it lacked consideration. Ellens v. Lind, 65 S.D. 620, 277 N.W. 40. This rule has been criticized and termed as harsh and technical by text writers. 1 C.J.S. Accord and Satisfaction § 26; 1 Am.Jur.2d, Accord and Satisfaction, § 35. In this state the hardship of the rule has been avoided by statute. SDC 47.0236 provides:

> "Part performance of an obligation, either before or after a breach thereof, when expressly accepted by the creditor in writing in satisfaction, or rendered in pursuance of an agreement in writing for that purpose, though without any new consideration, extinguishes the obligation."

This statute has been considered by us in a number of cases. In Qualseth v. Thompson, 44 S.D. 190, 183 N.W. 116, where a disputed and unliquidated claim was involved, it was held that endorsing and cashing a check marked "Balance for sawing lumber" was an acceptance in writing of part performance of the claimed obligation and a satisfaction thereof. The Qualseth decision was relied upon in Adams v. Morehead, 45 S.D. 216, 186 N.W. 830, where on a disputed claim of $240.83 for professional services the debtor mailed the creditor a draft for $100.00 with a letter that it was "to close my account". It was held that under the statute cashing of the draft resulted in an accord and satisfaction. See also Hamburger v. Economy Department Store, 54 S.D. 65, 222 N.W. 603.

The amount of the government payments for participation in the feed grain program was fixed, but the parties disputed the sharing thereof under the terms of the contract. McKeown tendered what he considered to be the Eberles' share of those payments and wrote "final" on the checks. The word "final" as used in the circumstances here present could have only one meaning to the parties as a matter of law. The record

before us will allow no other logical conclusion.[6] Under the statute acceptance of these checks by the Eberles extinguished the rental obligations under the lease for the years 1963 and 1964. Qualseth v. Thompson, supra; Larsen v. Zimmerman, 153 Me. 116, 135 A.2d 270.

Error is also assigned on the court's termination of the lease because of violations of its provisions by McKeown. The leasing agreement provided: "This lease may be terminated before the end of the agreed term: (1) By the Landlord when the Tenant has failed to pay the agreed rent * * * or has violated any other provisions of this lease."

The court found McKeown had failed to pay the Eberles (1) their share of the price support payments for 1963, 1964 and 1965 and the diverted acreage payment for 1965, (2) final payment of their share of corn, grain and hay for 1965 in the amount of $3,033.61, and (3) to furnish sketches of fields of crops planted by July 1st of each year as required by the lease. As we have pointed out supra, there was an accord and satisfaction of the 1963 and 1964 government payments. On this point we confine ourselves to consideration of (2) above since we believe this was ample basis for termination of the lease.

Final rent for 1965 was payable "When the average annual county yields are published by the South Dakota Crop and Livestock Reporting Service * * *". On June 11, 1966, Exhibit 16, the Eberles by letter advised McKeown that the balance of rents due was "$3,033.61 plus ASC payments?" Thereafter McKeown sent them a check for $3,194.31 which included $160.70 as a 2/5 share of the diverted acre payments. By letter dated June 23, 1966, Exhibit 23, Mrs. Eberle returned the check to McKeown and requested a check for $3,033.61 as the final payment except for "government payments (which) should be

---

6. Mrs. Eberle repeatedly testified there were final settlements for each of the years 1963 and 1964. For example: "Q Didn't you say, Mrs. Eberle, that for the year 1963 and 1964, there was a full statement? A Yes, there was a settlement, with the knowledge on our part that it wasn't a fair settlement * * * And we took a loss wherever it occurred, simply to keep relations on a workable basis * * *." Exhibit 23 is a letter written by Mrs. Eberle to McKeown on June 23, 1966 in which she stated: "We realized in '63 that you did not figure A.S.C. correctly but decided not to bring up the question at that point but wait till '64 to see what you would do. 64 year was O.K. but '65 was so much out of line that it couldn't again be accepted."

held over" until it was determined how they were to be shared under the lease. No subsequent offer or tender was made by McKeown.

McKeown was served with summons and complaint on August 6, 1966, which included a claim for the sum of $3,033.61, on which there was no dispute, but he made no offer or tender of payment until after judgment was entered on January 6, 1967, when he paid $3,033.61 which represented the balance of the 1965 rent except for government payments.

In our opinion, the failure to pay the sum of $3,033.61 after demand was clearly a violation of the provisions of the lease and justified the court in entering judgment terminating it.

■ McKeown argues the presentation of the check for the final 1965 crop share inclusive of $160.70 for government payments complied with the lease to such an extent as to prevent forfeiture. The record makes it clear that the check was tendered in payment on condition that it be accepted as a final settlement of rents for 1965 including government payments. Whatever doubt may have existed before, it is certain at that time McKeown was fully aware that the Eberles were claiming more than $160.70 as their share of the government's payments and would not accept the check tendered as final settlement for 1965. They promptly returned the check and demanded the rent due them not in dispute. No logical reason existed for McKeown to refuse to pay the sum of $3,033.61 immediately and failure so to do violated the leasing agreement.

■ The check tendered was not offered in evidence, but the inference is it bore notations similar to those referred to supra which McKeown claimed and we have held to be accords and satisfactions for the years 1963 and 1964. A tender accompanied by conditions which the debtor has no right to impose is without effect. Wiley v. Scott, Tex.Civ.App., 229 S.W.2d 650; 86 C.J.S. Tender § 32.

The judgment is modified by deducting therefrom the sum of $1,071.20 as rental for the years 1963 and 1964, and in all other respects affirmed.

HANSON, P. J., ROBERTS and BIEGELMEIER, JJ., and WUEST, Circuit Judge, concur.

WUEST, Circuit Judge, sitting for RENTTO, J., disqualified.