1998 SD 70

Laurie Jean Bryant HARKSEN, as Administrator of the Estate of John C. Harksen, a/k/a J.C. Harksen, Deceased, Plaintiff,

v.

Gene PESKA, Defendant and Appellant.

and

Warren Carter Johnson, Janet Johnson, Steven M. Johnson, Dave R. Johnson, Robert A. Warder, Jo Anna C. Warder, Robert A. Warder, Trustee, and Robert A. Warder, individually, Defendants and Appellees,

and

Everett P. Howe, Susan M. Kelts, T. Ashworth and E. Ashworth, Ruth Martens Lamont, Gordon O. Gavin and Donna J. Gavin, Scott L. McCaskell and Sharla R. McCaskell, Judith Goudy, Betty Peska, Defendants.

No. 20092.

Supreme Court of South Dakota.

Argued Jan. 14, 1998.

Decided July 1, 1998.

Rehearing Denied Aug. 7, 1998.

Gregory A. Eiesland and Michael C. Loos of Quinn, Eiesland, Day & Barker, Rapid City, for defendant and appellant.

Steven M. Johnson of Johnson, Heidepriem, Miner & Marlow, Sioux Falls, for defendants and appellees Johnsons.

Robert A. Warder, Warder Law Office, Hill City, for defendants and appellees Warders.

MILLER, Chief Justice.

[¶ 1.] Gene Peska purchased a tract of land in the Black Hills of South Dakota and built a "cabin" [1] thereon. A neighboring property owner, John Harksen, later brought suit to enforce restrictive covenants that limited the number of buildings that could be built on the land. In a bifurcated trial, the trial court determined that the restrictive covenants were not ambiguous, and that a mandatory injunction for the removal of the cabin should issue. Peska appeals. We affirm in part and reverse and remand in part.

## FACTS

[¶ 2.] On April 30, 1969, John C. Farrar and Ray J. Aldrich purchased 210 acres of scenic land in the Black Hills. Title was taken in their names, but it was understood that actual ownership of the land would be held by an informal partnership known as The Slate Creek Club.[2] Each member of The Slate Creek Club was to receive one lot for their participation.

[¶ 3.] On November 13, 1973, Farrar and Aldrich filed a Declaration of Protective and Restrictive Covenants in the Pennington County Register of Deeds' Office. The Declaration consisted of two prefatory paragraphs of recitals of ownership and intent and purpose of the owners,[3] followed by sev-

---

1. As will be noted later, this cabin is a summer residence valued at approximately $100,000.

2. The members of The Slate Creek Club were: Farrar, Aldrich, Robert W. Gunderson, Michael B. DeMersseman, and Robert A. Warder. They all were also law partners in Rapid City, South Dakota.

3. The stated intent and purpose of the covenants was "to insure the use of the property for sum- mer home purposes only, to prevent nuisances, to prevent the impairment of the attractiveness of the property, to maintain the desired tone of the community, and to thereby secure to each site owner the full benefit and enjoyment of his summer home, with no greater restriction upon the free and undisturbed use of his site than is necessary to insure the same advantages to other site owners[.]"

enteen specific covenants. Three of these covenants are applicable to this controversy, and provide:

(1) Restrictive covenants herein contained shall continue in force for a period of fifty (50) years from the date hereof and are applicable to any deed recorded after the date of these covenants.

(2) No more residences may be built on any parcel of property conveyed to a grantee after the date of these covenants than is specified in the deed to the first grantee.

\* \* \* \* \* \*

(11) There shall be no subdivision of any tract conveyed to a grantee and recorded after the date of these covenants except where residences in excess of one are permitted on the deed.

[¶ 4.] On January 22, 1974, Harksen and his wife Cynthia[4] purchased ten acres of the 210–acre tract from Farrar and Aldrich. Cynthia later quitclaimed her interest to Harksen.

[¶ 5.] A short time after Harksen purchased his ten-acre tract, Farrar and Aldrich executed and delivered a warranty deed for a twenty-seven and one-half acre site to Aldrich and his wife Lucille. Aldrichs had previously erected a residence on their site, and the deed to them did not contain a provision allowing for an additional residence.

[¶ 6.] In 1987, Aldrichs sold their land to Peggy Buckwheat. The deed to her stated: "Not more than one (1) additional residence shall be constructed upon the premises above-described for a term of fifty (50) years after the date hereof." Buckwheat sold twenty acres of the tract to Judith Goudy in May of 1990, and the remaining seven and one-half acres to Gene and Betty Peska in August, 1992.[5]

[¶ 7.] Peska had purchased the property with the intention of building a summer residence thereon. He received a letter on July 8, 1993, from Robert A. Warder, a member of the Slate Creek Club, who was also acting as Harksen's attorney at that time. The letter specifically advised Peska that "if there is any attempt to construct or build on this property in violation of the covenants on this property, Mr. Harksen ... will enforce the covenants by all legal or equitable means including, but not limited to injuctative [sic] relief." Peska did not contact an attorney after receiving the letter, but did seek assurances from Buckwheat and the realtor who sold him the property that he could build a residence. Peska received a county building permit on August 19, 1993, and commenced construction thereafter.

[¶ 8.] Peska was served with the summons and complaint in this action on September 22, 1993. Despite the pending lawsuit, Peska continued construction on the summer home, finally finishing three months later in mid-December of 1993. He valued the cabin at $130,000.[6]

[¶ 9.] The trial court bifurcated the proceedings, first having a trial as to whether the restrictive covenants were violated, followed by a second trial to ascertain the appropriate remedy. The trial court held the covenants were unambiguous and that they applied to any deed issued after November, 1973, when the covenants went into effect. It thus determined that the "deed to the first grantee" was the one from Aldrich and Farrar to Aldrich and his wife. The court then held covenant number 11 prohibited the further subdivision of Aldrichs' land, and covenant number 2 prohibited building any more residences on the land. Thus, under the court's ruling, Peska's seven and one-half acre tract and his cabin on that tract were in violation of the covenants.

[¶ 10.] After the separate hearing on the issue of remedies, the trial court issued a

---

4. Harksen passed away prior to trial and Cynthia, as executor or administrator of his estate, was substituted as plaintiff. For ease of reference, we will continue to refer to the plaintiff and appellee in this appeal as Harksen.

5. Betty Peska quitclaimed all of her right, title, and interest in this land to Peska in 1995.

6. Actually, of the $130,000 value Peska placed on the cabin, about $100,000 was attributable to the structure itself, and the remainder was attributable to the land. At the later remedy hearing, Peska also testified that the cabin cost him about $75,000 to build.

mandatory injunction requiring the removal of Peska's cabin. Peska appeals, and raises the following issues:

1. Whether the trial court erred in determining the restrictive covenants were unambiguous.

2. Whether the trial court erred in issuing a mandatory injunction ordering Peska to physically remove his cabin.

## STANDARD OF REVIEW

[¶ 11.] On appeal we read a covenant as we would a contract, that is, without any presumption that the trial court was correct. *Spring Brook Acres Water Users Ass'n, Inc. v. George,* 505 N.W.2d 778, 780 (S.D.1993) (citing *Baker v. Wilburn,* 456 N.W.2d 304, 306 (S.D.1990)). Whether a contract is ambiguous is a question of law. *Id.* (citations omitted). Questions of law are reviewed de novo. *Roth v. Roth,* 1997 SD 75, ¶ 7, 565 N.W.2d 782, 784.

[¶ 12.] As to the second issue, our review of a trial court's granting an injunction is: "(1) Were any of the facts found by the trial court clearly erroneous? and (2)[i]f not, taking the facts as true, did the court abuse its discretion in granting the injunction?" *Maryhouse, Inc. v. Hamilton,* 473 N.W.2d 472, 474 (S.D.1991).

## DECISION

[¶ 13.] **1. Whether the trial court erred in determining the restrictive covenants were unambiguous.**

 [¶ 14.] Peska argues that the restrictive covenants were ambiguous. Specifically, he takes issue with the language of covenant number 2, which provides:

No more residences may be built on any parcel of property conveyed to a grantee after the date of these covenants than is specified in the deed to the first grantee.

Peska claims the term "first grantee" is ambiguous. We do not agree.

 [¶ 15.] "A contract is ambiguous when application of rules of interpretation leave a genuine uncertainty as to which of two or more meanings is correct." *Spring Brook Acres,* 505 N.W.2d at 780. A contract is not ambiguous merely because two parties do not agree as to its proper construction. *Ducheneaux v. Miller,* 488 N.W.2d 902, 909 (S.D. 1992). Under the Plain Meaning Rule, if a term "appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature." *Spring Brook Acres,* 505 N.W.2d at 780 n. 2 (citation and internal quotations omitted).

[¶ 16.] The question in this case is whether the meaning of the phrase "first grantee" can be determined from looking at the whole document itself. Peska offers several possible interpretations of who the "first grantee" could be. First, he argues that the first grantee could be Aldrich and Farrar as they first took title for the partnership. Next, he claims that, since the covenants apply to all 210 acres, the first grantee could be any person who was the first to receive a tract of land from Aldrich and Farrar. Peska argues that person's deed would then control all others. Next, he maintains that the first grantee could have been the first person to take after the covenants were filed and, likewise, this person's deed would control all others. Finally, he claims that, since the covenants do not refer to partners, the first grantee could mean the first "non-partner" to receive a deed.

[¶ 17.] While Peska has suggested several examples of possible "first grantees," that fact alone is not sufficient to create an ambiguity. *Ducheneaux,* 488 N.W.2d at 909. A plain reading of the covenants indicates that the "first grantee" is the person or persons who first received a deed after the covenants were filed. Covenant number 1 specifically states the covenants are applicable to any deed recorded after the date of the covenants. Therefore, Peska's assertions that the "first grantee" could be limited to one person are unfounded. Also, the specific language of covenant number 2 states that the critical time is "after the date of these covenants."

[¶ 18.] Peska's argument that, because the partnership is not mentioned in the covenants, the covenants do not apply until after a deed to a non-partner has been executed

also fails. He states that no provision in South Dakota law prevents the partners from excluding themselves from the covenants. This may be true, but the partners did not exclude themselves. The very fact that the partners are not mentioned in the covenants indicates that the covenants were meant to apply to the partners, too. We will not read exceptions into the instrument, especially when the language is clear on its face.[7]

[¶ 19.] Finally, Peska maintains that the real purpose of restrictive covenants is the protection of property values and, since there was testimony that his cabin increased the value of the land, it should result in a reading of the covenants favorable to him. *See Piechowski v. Case*, 255 N.W.2d 72, 75 (S.D. 1977). Our decision in *Piechowski* was centered around a residential subdivision, a very different setting than what we have here. "[I]t is a primary rule of construction that the real intention of the parties, particularly that of the grantor, should be sought and carried out whenever possible." *Northwestern Pub. Serv. Co. v. Chicago & N.W. Ry. Co.*, 87 S.D. 480, 484, 210 N.W.2d 158, 160 (1973) (citation omitted). Here, the Declaration of Protective and Restrictive Covenants specifically states that the intent and purpose of the owners was to insure the use of the property for summer home use only, and basically to preserve the attractiveness and tone of the community. Our reading of the covenants complements this intent.

■ [¶ 20.] " 'A contract should be considered as a whole and all of its parts and provisions will be examined to determine the meaning of any part.' " *Piechowski*, 255 N.W.2d at 74 (quoting *Eberle v. McKeown*, 83 S.D. 345, 349, 159 N.W.2d 391, 393 (1968)). In reviewing the covenants as a whole, the only fair interpretation of the phrase "first grantee" mandates a holding that it applies to all deeds issued after the covenants were executed. As to Peska's property, the "first grantees" were Aldrich and his wife who received the property from the original title

holders, Aldrich and Farrar. Since this first deed did not "specify" the number of residences that could be built on the tract of land, no more could be built than already existed. Thus, Peska's cabin was built in violation of the covenants. This is the only fair reading to give to the covenants and it also protects the intent and purpose behind those covenants. Thus, we affirm the trial court on this issue.

**[¶ 21.] 2. Whether the trial court erred in issuing a mandatory injunction ordering Peska to physically remove his cabin.[8]**

■ [¶ 22.] Peska argues the trial court erred in issuing a mandatory injunction requiring him to physically remove his cabin from the land. He argues that, if any remedy is necessary, it should be money damages and not an injunction.

[¶ 23.] SDCL 21–8–14 generally provides that a permanent injunction may be granted:

(1) Where pecuniary compensation would not afford adequate relief;

(2) Where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief;

(3) Where the restraint is necessary to prevent a multiplicity of judicial proceedings; or

(4) Where the obligation arises from a trust.

■ [¶ 24.] There are four basic factors to guide our courts in exercising discretion concerning injunctive relief:

(1) Did the party to be enjoined cause the damage?

(2) Would irreparable harm result without the injunction because of lack of an adequate and complete remedy at law?

(3) Is the party to be enjoined acting in bad faith or is its injury-causing behavior an "innocent mistake"?

---

7. Peska also relies on testimony from some of the partners as to their intentions not to be bound. We need not and cannot consider this outside testimony, as the instrument is not ambiguous.

8. As stated earlier, our standard of review for this issue is to ascertain whether any of the facts found by the trial court were clearly erroneous and, if not, whether the trial court abused its discretion in issuing a mandatory injunction. *Maryhouse, Inc.*, 473 N.W.2d at 474.

(4) In balancing the equities, is the "hardship to be suffered by the [enjoined party] ... disproportionate to the ... benefit to be gained by the injured party"?

*Maryhouse, Inc.*, 473 N.W.2d at 475 (citations omitted).

[¶ 25.] There is no doubt Peska's actions caused the damage. He was responsible for building the cabin in violation of the covenants. Thus, the first question is answered affirmatively.

[¶ 26.] The trial court also found an award of money damages would be inadequate and we see no error. After hearing all the testimony and viewing the property, the trial court stated in its memorandum opinion that "an award of damages is inappropriate for 2 reasons: First: anyone with enough money to pay damages could violate the restrictive covenant with impunity. Second, the covenants were placed on the property to prevent violations not to compensate for or punish violations." Given the purpose of the covenants to maintain the desired tone of the land, to prevent nuisances, and to secure the attractiveness of the land, even a "minor" violation of the covenants could be irreparable. No matter how aesthetically pleasing the cabin may be to some, the fact is that it was knowingly built in violation of the covenants and stands in defiance of the covenants, effecting the natural look of the land to be preserved.[9]

[¶ 27.] Peska argues his building the cabin was an "innocent mistake" because he did not think he was violating the covenants. He claims his contract for the land provided that he could build on it and the seller also told him he could build there. Furthermore, Peska claims his realtor told him it was okay to build the cabin, and that a letter from Aldrich and attached to Peska's deed also indicated the covenants did not prevent him from building.

[¶ 28.] However, before he began construction, Peska received a letter from Warder, Harksen's attorney. The letter, which was directed to Peska and his wife, stated in salient part:

You know, or presume to know, of the Declaration of Protective and Restrictive Covenants upon this property, a copy of which I have enclosed to you. Your attention is drawn to Paragraph 2 of the covenants, and also to Paragraph 11 of the covenants.

\* \* \* \* \* \*

This is to advise you that if there is any attempt to construct or build on this property in violation of the covenants on this property, Mr. Harksen and any other owner that so chooses will enforce the covenants by all legal or equitable means including, but not limited to injuctative [sic] relief.

If you have an attorney, please advise him to contact me.

This letter was written on July 2, 1993, and received by Peska on July 8. Other than visiting with Buckwheat and a realtor, he did nothing. Furthermore, despite service of the summons and complaint upon him in September of 1993, he continued to build the structure for three more months even though construction was less than a month along.

[¶ 29.] Peska claims the letter from Warder does not indicate he could not build on the land. He focuses on the portion of the letter that states Harksen will enforce the covenants if there is any attempt to build "in violation of the covenants."

[¶ 30.] Peska attempts to take a portion of the Warder letter and make it appear ambiguous. However, the letter refers to two specific covenants and states that "any" attempt to build in violation of the covenants will force Harksen to seek relief. The letter even suggests that Peska have his lawyer contact Warder. Everything considered, Peska's actions do not constitute an "innocent mistake."

[¶ 31.] The last factor to guide a court in issuing an injunction is the balancing of the equities, or what is known as the "relative hardship test." *See Foley v. City of Yankton*, 89 S.D. 160, 165–66, 230 N.W.2d 476, 479 (1975). Peska claims his cabin is worth about $100,000, and removing it would totally

---

9. Peska claims money damages are appropriate, but cannot point to what would be adequate. He argues for mere nominal damages or no damages at all.

destroy it, because it would have to be removed in pieces due to the narrow entrance road to the property. He also claims there is no hardship to be suffered by Harksen as the cabin is barely visible from Harksen's property.

[¶ 32.] A critical factor in balancing equities is that the party being enjoined knew that he was violating the covenant. *Foley*, 89 S.D. at 166, 230 N.W.2d at 479 (stating "[a]n additional factor that the court should consider is the state of mind of the party against whom the mandatory injunction is sought.").[10] Here, Peska knew he was violating the covenants, however, the fact remains that the cabin is barely visible from the edge of Harksen's land, and not visible at all from Harksen's building site.

[¶ 33.] We hold the trial court did not abuse its discretion in issuing an injunction, but the injunction was simply too harsh considering the intangibility of the harm suffered by Harksen.[11] Thus, it constitutes an abuse of discretion. It would be inequitable to require the destruction of a $100,000 summer residence when there really is no burden on Harksen. Similarly, it would also be inequitable to let Peska pay mere nominal damages or no damages at all, when he built the structure knowing he was violating the covenants.

[¶ 34.] On remand, we direct the trial court to modify the injunctive relief. In so doing, the court should consider that the covenants are only to be in effect for about twenty-five more years. A new injunction could be entered which would be effective until the covenants expire, and require Peska to strictly comply with all the existing covenants. It could prevent him from making additions or changes to the exterior of the cabin and to the rest of the property. The trial court could also require that, for the remaining years the covenants are in effect, the cabin can remain on the property only so long as it is owned by Peska or any member of his immediate family. This would prevent him from profiting from knowingly violating the covenants. It would also be sensitive to the fact that the cabin does not directly burden Harksen. We remand to the trial court to modify the injunction consistent with this opinion.

[¶ 35.] Affirmed in part, and reversed and remanded in part.

[¶ 36.] SABERS, AMUNDSON and GILBERTSON, JJ., concur.

[¶ 37.] VON WALD, Circuit Judge, dissents.

[¶ 38.] VON WALD, Circuit Judge, sitting for KONENKAMP, Justice, disqualified.

VON WALD, Circuit Judge (dissenting).

[¶ 39.] I agree with the majority on issue one, but disagree on issue two that the injunction ordered by the circuit court was an abuse of discretion.

[¶ 40.] Our function on review is not to determine whether the Court would issue the same type of injunction, but to determine whether there was an abuse of discretion in issuing an injunction. An abuse of discretion "refers to a discretion exercised to an end or

---

10. Such knowledge has even prevented some courts from applying the relative hardship test. *Foley*, 89 S.D. at 166, 230 N.W.2d at 479 (stating that "the court will not balance equities where the actions of the defendant were taken willfully and with full knowledge of plaintiff's rights and the consequences which might ensue.") (citing *Wilson Concrete Co. v. County of Sarpy*, 189 Neb. 312, 202 N.W.2d 597 (1972)). See *Morgan v. Veach*, 59 Cal.App.2d 682, 139 P.2d 976, 980–81 (1943) (holding that "one who deliberately violates building restrictions placed upon his lot ... cannot avoid a mandatory injunction so to build as to comply with the restrictions, on the theory that the loss caused by it will be disproportionate to the good accomplished.") (citation and internal quotations omitted).

11. The dissent claims we should not only look at the harm suffered by Harksen, but also the harm suffered by the other cabin owners in the Slate Creek development. We did to the extent of the evidence. None of the other owners joined in Harksen's suit against Peska, and some of the original developers had supported Peska's right to build. The other landowners were named as defendants, and some agreed with Harksen that the restrictive covenants are enforceable against Peska, but none apparently articulated how Peska's cabin damages their own property. The only one to bring suit and testify as to harm suffered was Harksen, and, thus, that is all we can consider.

purpose not justified by, and clearly against, reason and evidence." *Maryhouse, Inc. v. Hamilton,* 473 N.W.2d 472, 474 (S.D.1991). The majority did not believe the trial court abused its discretion in issuing an injunction, but believed the type of injunction ordered was an abuse of discretion because of the outweighing harm to Peska. The question of balancing the equities need not even be addressed in this case, but even if it was, I do not believe requiring removal of the cabin was an abuse of discretion.

[¶ 41.] The trial court did not need to weigh the equities between the parties because South Dakota has recognized that the "relative hardship" test does not apply when the defendant acted willfully and with full knowledge of the plaintiff's rights and the consequences which might ensue. *Foley v. City of Yankton,* 89 S.D. 160, 230 N.W.2d 476, 479 (1975) (citing *Wilson Concrete Company v. County of Sarpy,* 189 Neb. 312, 202 N.W.2d 597 (1972)). *See also Morgan v. Veach,* 59 Cal.App.2d 682, 139 P.2d 976, 980 (1943) (holding that one who deliberately violates building restrictions placed upon his lot … cannot avoid a mandatory injunction on the theory that the loss caused by it will be disproportionate to the good accomplished).

[¶ 42.] The injunction requiring Peska to remove his cabin may be harsh, but it is warranted because Peska was warned of this possible remedy. Before Peska commenced any construction, he received a letter from Warder, Harksen's attorney, which pointed out the restrictive covenants applicability to his property, and advised him that if he constructed on the property, Harksen would enforce the covenants by all legal and equitable means including, but not limited to injunctive relief. After Peska began construction, he was served with the summons and complaint in this matter, but continued to build for three additional months. Peska was clearly on notice that the covenants existed and that they would be enforced, yet he chose to ignore the warnings. Therefore, this Court should not be weighing the hardship to Peska if the injunction is enforced against the benefit gained to Harksen.

[¶ 43.] Furthermore, the majority only looks at the harm suffered by Harksen while they should be looking at the harm suffered by every other cabin owner in the Slate Creek development, many of whom are named parties joining in Harksen's request for relief, and any other person trying to enforce restrictive covenants. The purpose of this restrictive covenant was to prevent nuisances, to prevent impairment of the attractiveness of the property, and to maintain the desired tone of the community. The majority's holding breeds instability into the law of property by permitting Peska's cabin to remain as is, which cabin was knowingly built in violation of a restrictive covenant. Is this Court, by placing a simple restriction of not allowing Peska to sell the cabin for the remainder of the restrictive covenant, encouraging others to intentionally violate covenants in anticipation of some minimal restrictions? Many other landowners in the Slate Creek development could build in contravention of the restrictive covenants with little deterrence and completely destroy the covenant's purpose.

[¶ 44.] Under SDCL 21-8-14(3), a permanent injunction may be granted where it would be necessary to prevent a multiplicity of judicial proceedings. Other present and future Slate Creek landowners could build new cabins in violation of the restrictive covenants causing a multiplicity of litigation. Even though the injunction requiring Peska to remove his cabin would be a substantial loss to him, it is the only reasonable injunction the circuit court could have imposed to prevent future landowners from building homes in violation of the restrictive covenants. If the Court considers the fact that Peska could have verified whether or not he was violating the covenant before building, could have halted the building process once this action was started, and considers the potential floodgates of litigation that will be opened by not requiring removal of the cabin, the equities are not disproportionate to the mandatory injunction instituted by the circuit court.

[¶ 45.] The appropriate injunction is one that will stop the wrongful action or undo a wrongful act to conform to the covenant. The covenant stated that no more residences may be built on this particular parcel of

property. Therefore, if a residence is built in contravention of this covenant, the only appropriate injunction is to require the violator to move the residence or tear it down. Peska's purpose in building the cabin was to have a summer home in Slate Creek in the Black Hills irrespective of the restrictive covenant, and the majority is not stopping him from doing that. The circuit court did not abuse its discretion and its injunction should be enforced.