#23683, #23708-aff in pt, rev in pt & rem-JKM

**2006 SD 47**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MARVIN J. HALLS,                           Plaintiff and Appellant,

    v.

JERRY A. WHITE and
JANET D. WHITE,                           Defendants and Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
FALL RIVER COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JANINE M. KERN
Judge

* * * *

PATRICK M. GINSBACH
HEATHER M. SUDBECK of
Farrell, Farrell and Ginsbach          Attorneys for plaintiff
Hot Springs, South Dakota              and appellant.

TIMOTHY L. THOMAS of
Thomas, Nooney, Braun, Solay &
  Bernard, LLP                           Attorneys for defendants
Rapid City, South Dakota               and appellees.

* * * *

ARGUED ON FEBRUARY 14, 2006

OPINION FILED **05/24/06**

MEIERHENRY, Justice.

[¶1.]        Marvin J. Halls (Halls) sought a permanent injunction against Jerry and Janet White (Whites) to enforce a restrictive covenant prohibiting the use of a mobile home as a temporary or permanent residence in a housing development. Whites claimed that the covenants do not prohibit moving a "manufactured home" onto their lot because the definition of "mobile home" is different from and does not include "manufactured home." Whites also claimed that Halls should be denied equitable relief because of unclean hands. Based on the evidence, the trial court found Halls could seek equitable relief; however, the court denied the relief. The court determined that the definition of "mobile home" as used in the restrictive covenant did not preclude Whites from placing their manufactured home on the lot. We affirm the trial court's determination that Halls could seek injunctive relief, but we reverse the denial of the permanent injunction.

## FACTS

[¶2.]        Gary and Meredith Shelstead established the Pine Haven development in 1974 along with Malon and Katherine Anderson. Pine Haven included twenty lots which were subject to certain covenants and restrictions running with the land.[1] On November 29, 2004, Whites, as buyers, and Gary and Meredith

---

1.    The covenants, which were recorded in 1976, included 17 numbered provisions preceded by a preamble. Whites' structure did not violate any of the other provisions. The preamble declares that the purpose of the covenants was for "enhancing and protecting the value, desirability, and attractiveness of the lands and every part thereof." Other restrictions limited certain lots to single family units not exceeding two stories, garages were limited to housing no more than three cars, either attached or separate. Storage and pet structures were allowed on the lots. Total structures were

(continued . . .)

Shelstead, as sellers, signed a purchase agreement for a Pine Haven lot. Whites'

offer, however, was contingent on whether they would be allowed to place a

manufactured home on the lot. Gary Shelstead (Shelstead) agreed to that

contingency.

[¶3.]        Whites closed on the property in early 2005. Shortly thereafter they

began the process of moving the home onto the lot. This prompted Halls, a resident

of Pine Haven, to seek injunctive relief against Whites. Halls sought to enforce the

Pine Haven covenants' restriction against mobile homes. Halls claimed that

Whites' manufactured home fell within the "mobile home" restriction of the

covenants. The trial court granted a temporary restraining order in Halls' favor.

After a hearing, however, the trial court dissolved the temporary restraining order

and denied Halls' request for a permanent injunction. Halls appeals that

determination and presents for review the following issue:

_____

(. . . continued)

>    limited to four per lot, including the dwelling. A one-story dwelling had to
>    measure at least 1300 square feet; a two story dwelling had to be at least
>    1500 square feet. Placement of the family dwelling had to be on concrete or
>    cement block foundation and had to be a minimum 24 feet long. Horses, cows
>    and sheep were allowed on each home site, "but no more than three animals
>    [] allowed on any one lot," unless the animals were 4-H or FFA projects and
>    cared for properly. Swine, unless kept as 4-H or FFA project, and  poultry,
>    kennels, billy goats or boarded horses were not allowed. All lots with large
>    animals had to be fenced to comply with SDCL 43-23-4. Other provisions
>    involved set backs, garbage disposal, sewage disposal and culverts. The
>    provisions ran with the land and "were binding on all parties and all persons
>    claiming under them for a period of thirty years from the date the[] covenants
>    [were] recorded." After thirty years, covenants would be "automatically
>    extended for successive periods of ten years unless an instrument signed by a
>    majority of the then owners of the lots had[] been recorded, agreeing to
>    change said covenants in whole or in part."

Whether the trial court erred in holding that the Pine Haven covenants allowed Whites to place a manufactured home on their lot.

## STANDARD OF REVIEW

[¶4.]     Our review of a trial court's decision regarding injunctive relief is well established:

> Granting or denying an injunction rests in the sound discretion of the trial court. We will not disturb a ruling on injunctive relief unless we find an abuse of discretion. An abuse of discretion can simply be an error of law or it might denote a discretion exercised to an unjustified purpose, against reason and evidence.

Hendrickson v. Wagners, Inc., 1999 SD 74, ¶14, 598 NW2d 507, 510-11 (quoting Knodel v. Kassel Twp., 1998 SD 73, ¶6, 581 NW2d 504, 506) (citations omitted)). In doing so, we review the trial court's findings of fact under a clearly erroneous standard, but we give no deference to the trial court's conclusions of law. *Id.* ¶9, 598 NW2d at 509 (citations omitted). The interpretation of a covenant is a legal question which we review de novo. Harksen v. Peska, 1998 SD 70, ¶11, 581 NW2d 170, 173. Equitable determinations, however, are reviewed only for abuse of discretion. Adrian v. McKinnie, 2002 SD 10, ¶9, 639 NW2d 529, 533.

## DECISION

*Applicability of Covenants to Whites' Manufactured Home*

[¶5.]     The covenant provision at issue is entitled, "Mobile Homes, Trailers and Basement Houses Prohibited." It provides:

> No mobile home or trailer or basement house shall be used as a residence at any time, either temporary or permanent, on any of the lots in the above described subdivision. No mobile homes, excepting utility or camping trailers, may be stored on any lot.

The trial court found ambiguity in the term "mobile home" because it was not defined elsewhere in the covenants. Consequently, the trial court looked beyond the document to the statutory definitions of "mobile home" and "manufactured home." In addition, the trial court considered Shelstead's intent when drafting the covenants as well as testimony from realtors and contractors. Shelstead testified that he used the term "mobile homes" to mean pull-behind campers and self-contained motor homes. Construing the restrictive covenant strictly in favor of free use of property, the trial court concluded that covenants did not apply to Whites' "manufactured home."[2]

[¶6.]     Halls claims that the trial court erred in finding ambiguity in the term "mobile home" and should have applied the ordinary meaning set out in the South Dakota statutes in effect at the time the covenants were written in 1976. Alternatively, Halls argues that if the term is found ambiguous, it should be construed against the preparer and in favor of the testimony of several witnesses who testified that the commonly accepted definition of "mobile home" was the 1976 statutory definition. Under either scenario, Halls maintains that Whites' manufactured home falls within the covenant's prohibition of using a "mobile home"

---

2.     Whites' home clearly falls within the statutory definition of "manufactured home." *See infra* ¶12. It consisted of two 14-feet-wide sections which were 72 feet long. Those sections were built on permanent chassis and they included plumbing, heating, air conditioning, and electrical systems. Once erected on Whites' Pine Haven lot, the home consisted of 1989 square feet. The mechanisms used to haul the home to Pine Haven, including the wheels and the axels, were not included in the purchase price and were removed once the home was placed on its foundation, which consisted of concrete block footings and concrete piers. All the documentation concerning Whites' home refers to it as a "manufactured home."

as a residence and that our decisions in Farnam v. Evans, 306 NW2d 228 (SD 1981), and Vaughn v. Eggleston, 334 NW2d 870 (SD 1983), control.

[¶7.] When interpreting the terms of a restrictive covenant, we use the same rules of construction applicable to contract interpretation. *See Harksen*, 1998 SD 70, ¶¶11-20, 581 NW2d at 173-74. A term is ambiguous if it is reasonably capable of being understood in more than one sense. Piechowski v. Case, 255 NW2d 72, 74 (SD 1977). Thus, a covenant is ambiguous if we have "a genuine uncertainty as to which of two or more meanings is correct." *Harksen*, 1998 SD 70, ¶15, 581 NW2d at 173 (citation omitted). A finding of ambiguity, however, requires more than the disagreement of two parties as to the meaning of a term. *Id.* (citation omitted). We have said, "[u]nder the Plain Meaning Rule, if a term 'appears to be plain and unambiguous on its face, its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature.'" *Id.* (citation omitted).

[¶8.] The provision in the covenant clearly prohibits using a mobile home as a residence. It specifies that "[n]o mobile home . . . shall be used as a residence at any time, either temporary or permanent, on any of the lots in the above described subdivision." Because the term "mobile home" was not defined in the covenant, the trial court determined the term was ambiguous. Failure to define a term in a covenant, however, does not automatically create ambiguity. We have said that a term is not ambiguous if "the term . . . has a plain and ordinary meaning and that meaning can be defined." Spring Brook Acres Water Users Ass'n, Inc. v. George, 505 NW2d 778, 780 (SD 1993). Guidance as to the plain and ordinary meaning of a

term in a restrictive covenant may come from statutory definitions. *Cf.* Divich v. Divich, 2002 SD 24, ¶¶12-13, 640 NW2d 758, 762 (relying on the statutory definition of "benefit" in determining that the term had a plain and ordinary meaning as used in a divorce stipulation). Other courts have relied upon statutory definitions to determine the plain and ordinary meaning of an undefined word in a restrictive covenant. *See, e.g.*, Adult Group Props, Ltd. v. Imler, 505 NE2d 459, 465-66 (IndCtApp 1987) (considering definitions from case law, statutes, and a legal dictionary when interpreting the term "family" in a restrictive covenant); Newman v. Wittmer, 277 Mont 1, 8-9, 917 P2d 926, 930-31 (1996) (determining that a sentence in a restrictive covenant which prohibited mobile homes to be used as a residence was not ambiguous); Hill v. Cmty. of Damien, 121 NM 353, 359-60, 911 P2d 861, 867-68 (1996) (considering the definition of "family" in zoning ordinances when interpreting that undefined term in a restrictive covenant); LuMac Dev. Corp. v. Buck Point Ltd. P'ship, 573 NE2d 681, 685-86 (OhioCtApp 1988) (consulting the statutory definition of "house trailer" which existed when covenants were drafted in order to determine if a "manufactured home" constituted a "house trailer" under restrictive covenants). Thus, the plain, ordinary meaning of a term in a covenant may be gleaned from statutory definitions. Consequently, we turn our attention to the term, "mobile home," as established by South Dakota and federal law.

[¶9.]     At the time the Pine Haven covenants were drafted, South Dakota law defined the term "mobile home." *See Farnam*, 306 NW2d at 229-30 (setting forth the statutory definition of "mobile home"). The term first appeared in South Dakota law in 1973. At that time, the statutory definition provided:

> "Mobile home," a moveable or portable unit, designed and constructed to be towed on its own chassis (comprised of frame and wheels), and designed to be connected to utilities for year-round occupancy. The term shall include: (a) units containing parts that may be folded, collapsed or telescoped when being towed and that may be expanded to provide additional cubic capacity; and (b) units composed of two or more separately towable components designed to be joined into one integral unit capable of being separated again into the components for repeated towing. The term shall include units designed to be used for residential, commercial, educational or industrial purposes, excluding however, recreational vehicles as defined in this Act.

1973 SD Laws ch. 216, § 1. The "Act" referred to in the statute defining "mobile home" is the South Dakota Mobile Home Safety Act, 1973 SD Laws ch. 216. Along with defining "mobile home," the South Dakota Mobile Home Safety Act established safety guidelines applicable to the sale or rental of mobile homes in South Dakota. *See* 1973 SD Laws ch. 216, §§ 2-16. The state agency then known as the Department of Commerce and Consumer Affairs was responsible for administering those guidelines. *See id.* The Mobile Home Safety Act was codified in Chapter 34-34A of the South Dakota Codified Laws.

[¶10.]     One year after South Dakota adopted mobile home safety standards, the federal government did the same. As a part of the Housing and Community Development Act of 1974, Congress enacted the National Mobile Home Construction and Safety Standards Act of 1974, which sought "to reduce the number of personal injuries and deaths and the amount of insurance costs and property damage resulting from mobile home accidents and to improve the quality and durability of mobile homes" by establishing "federal construction and safety standards for mobile homes" and authorizing "mobile home safety research and development." Housing

& Community Development Act of 1974, Pub. L. No. 93-383, §§ 601-02, 88 Stat. 633 (1974) (codified at 42 USC 5401). Like the South Dakota enactment, the federal act provided a definition of mobile home:

> "Mobile home" means a structure, transportable in one or more sections, which is eight body feet or more in width and is thirty-two body feet or more in length, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems contained therein.

*Id.* § 603(6) (codified at 42 USC 5402). Neither the South Dakota Mobile Home Safety Act nor the National Mobile Home Construction and Safety Standards Act of 1974 contained a definition of the term "manufactured home."

[¶11.] In 1980, however, Congress amended the National Mobile Home Construction and Safety Standards Act of 1974 so as to change all uses of the term "mobile home" to "manufactured home." Housing and Community Development Act of 1980, Pub. L. No. 96-399, § 308(c)(4)-(5). Thus, the definition of "mobile home" established by Congress in 1974 became the definition of "manufactured home," and the federal standards ceased to refer to "mobile home." The Conference Report of the United States House of Representatives recognized the name change when it stated that "[i]t is expected that for a reasonably brief transition period the term 'mobile home' may have to be used interchangeably with the term 'manufactured home.'" HR Conf Rep No 96-1420, at 129 (1980), *reprinted in* 1980 USCCAN 3617, 3674.

[¶12.] South Dakota followed suit in 1982. That year the Legislature deleted the definition of "mobile home" from SDCL 34-34A-1 and added a definition of

"manufactured home." 1982 SD Laws ch. 361, § 1. The definition of "manufactured home" reflected the definition provided by federal law for the same term—that is, the federal definition which previously applied to "mobile home." *See id.* In relevant part, the 1982 enactment provided that as used in Chapter 34-34A, the terms "manufactured home" and "home" mean:

> [A] structure, transportable in one or more sections, which is eight body feet or more in width or forty body feet or more in length in the traveling mode, or is three hundred twenty or more square feet when erected on a site; which is built on a permanent chassis and designed to be used as a dwelling, with or without a permanent foundation, when connected to the required utilities; and which contains the plumbing, heating, air conditioning and electrical systems therein. The term includes any structure which meets all the requirements of this subdivision and any other structure which has been certified by the secretary of housing and urban development.

1982 SD Laws ch. 267, § 1. Significantly, the session law which amended SDCL 34-34A-1 was titled, "An act to revise *mobile home* safety requirements in accordance with the national *manufactured housing* construction and safety standards program." 1982 SD Laws ch. 267 (emphasis added). In 1990, the definition of "manufactured home" was moved to SDCL 34-34A-1.1. The changes made in 1990 are still in effect today, and the statute currently provides:

> A manufactured home is a structure that meets the following requirements:
> (1) It is transportable in one or more sections;
> (2) Its body is eight or more feet wide or forty or more feet long in the traveling mode or it occupies three hundred twenty or more square feet when erected on a site;
> (3) It is built on a permanent chassis;
> (4) It is designed to be used as a dwelling with or without a permanent foundation when it is connected to the required utilities.
> The term includes the plumbing, heating, air conditioning, and electrical systems contained in the structure. The term also

> includes any structure that meets all of the requirements of this section except the size requirements and for which the manufacturer voluntarily files a certification required by the secretary and complies with the standards established under [Chapter 34-34A].

SDCL 34-34A-1.1.[3]  Thus, the structure formally referred to as a "mobile home," in effect, was renamed "manufactured home."

[¶13.]    Several other courts have also noted the evolution of the terms "house trailer," "mobile home," and "manufactured home" when considering the meaning of those terms.  *See, e.g.*, White v. McGowen, ___ SW3d ___, ___, 2006 WL 62131 (Ark Jan. 12, 2006); Wilmoth v. Wilcox, 734 SW2d 656, 658 (Tex 1987); Carr v. Michael Motors, Inc., 210 WVa 240, 246-47, 557 SE2d 294, 300-01 (WVaCtApp 2001).  As one court stated,

> [T]he term "house trailer" acquired an undesirable connotation resulting in a concerted effort by the industry to change its image.  In the late 1960's the term "mobile home" began to replace the term "house trailer."  In the late 1970's the industry applied the term "manufactured home" to the products, replacing the name "mobile home."

*Wilmoth*, 734 SW2d at 658.  Another court stated,

> "We use the term 'mobile home' interchangeably with the term 'manufactured home,' while acknowledging that the construction of mobile homes has improved greatly over the past thirty years.  However . . . 'Even though mobile homes have a more pejorative connotation than manufactured housing, it is merely a rose by another name.'"

McCollum v. City of Berea, 53 SW3d 106, 107 n1 (KyCtApp 2000).

---

3.    The same definition of "manufactured home" exists in the motor vehicle licensing statutes at SDCL 32-3-1(6).

[¶14.] The evolution of the term "mobile home" is instructive in this case. It appears, as other courts have pointed out, that the term "manufactured home" has replaced the term "mobile home" in modern parlance. "Mobile home," as defined in South Dakota in 1976, included "a moveable or portable [residential] unit, designed and constructed to be towed on its own chassis (comprised of frame and wheels), and designed to be connected to utilities for year-round occupancy." *See Farnam*, 306 NW2d at 229-30. It included "units composed of two or more separately towable components designed to be joined into one integral unit capable of being separated again into the components for repeated towing." *See id.* The definition of "manufactured home" in the current statute is very similar. *See* SDCL 34-34A-1.1. A "manufactured home" is a dwelling structure that "is transportable in one or more sections" "is built on a permanent chassis," contains "the plumbing, heating, air conditioning, and electrical systems," and is "designed to be used as a dwelling with or without a permanent foundation when it is connected to the required utilities." SDCL 34-34A-1.1. The Pine Haven covenants clearly sought to exclude "mobile homes." In light of the evolution of the term, we are convinced that the plain, ordinary meaning of "mobile home" as used in the restrictive covenant now includes "manufactured homes."

[¶15.] Whites argue, however, that their home is not a "mobile home" because that term maintains a meaning separate from "manufactured home" under South Dakota law. While Whites are correct that the term "mobile home" still appears in other sections of the South Dakota code, it no longer appears in the section of the law which sets forth the safety standards applicable to such homes, SDCL Chapter

34-34A.[4]  In fact, for a period of time the term was completely removed from the statutes.  In 1982, the term "mobile home" and its definition in Chapter 34-34A were replaced by the term "manufactured home" and its definition under federal law.  In 1985, an act by the Legislature to correct minor errors and inconsistencies reinserted the definition of "mobile home" into SDCL 34-34A-1.  1985 SD Laws ch. 15, § 42.  In 1990, however, that definition was again removed.  1990 SD Laws ch. 278 (entitled "An act to revise provisions relating to manufactured homes and to provide for the promulgation of certain rules").  Since 1990, the term "mobile home" has not appeared in Chapter 34-34A.

[¶16.]        Even if we were to look to the current statutory definition of "mobile home" in the motor vehicle statutes, we cannot say that Whites' manufactured home falls outside that definition.  The characteristics of Whites' home are virtually indistinguishable from the home at issue in *Farnam*, which we found to fall within the original definition of "mobile home."  *See* 306 NW2d at 229-30.  It therefore follows that the covenants preclude the placement of Whites' manufactured home on the Pine Haven lot.  The trial court's ruling to the contrary was in error.

---

4.      Currently, the definition of "mobile home" appears in two places in the code, both of which lie within the motor vehicle statutes, Title 32.  *See* SDCL 32-3-1; SDCL 32-7A-1.  It appears in SDCL 32-3-1(8) and provides the definition of "mobile home" for purposes of chapter 32-3 (Title Registration, Liens and Transfers), chapter 32-3A (Title, Registration and Taxation of Boats), chapter 32-4 (Theft and Misappropriation of Vehicles), chapter 32-5 (Annual Registration and License Plates), chapter 32-5A (County Wheel Tax), and chapter 32-5B (Excise Tax on Motor Vehicles).  Additionally, it appears in SDCL 32-7A-1(5) and provides the definition of "mobile home" for purposes of chapter 32-7A (Dealers and Manufacturers of Manufactured Homes and Mobile Homes).

*Unclean Hands*

[¶17.]        Whites argued to the trial court that Halls was not entitled to injunctive relief because of the doctrine of unclean hands.  They claimed that Halls breached the covenants when he placed a mobile home on his lot during construction of his current home.  The trial court determined that Halls purged himself of unclean hands.  We review the trial court's determination under an abuse of discretion standard.  *Adrian*, 2002 SD 10, ¶9, 639 NW2d at 533.  Under the facts of this case, we cannot say that the trial court abused its discretion.

[¶18.]        We have recognized the doctrine of unclean hands which requires that "[a] party seeking equity must act fairly and in good faith."  Action Mech., Inc. v. Deadwood Historic Pres. Comm'n, 2002 SD 121, ¶26, 652 NW2d 742, 751.  In the same vein, we have stated that "the right to enforce restrictive covenants may be lost."  *Vaughn*, 334 NW2d at 873.  None of our cases, however, consider whether unclean hands have been purged.  Under that concept, "[i]f a person guilty of unconscionable or wrongful conduct purges himself or herself by adequate and effective renunciation and repudiation, the right to relief will be restored."  27A Am Jur 2d Equity § 135; *see also* Beavers v. Walters, 537 NW2d 647, 651 (ND 1995) (stating that "one who purges himself of his wrongdoing will have his right to relief restored" and finding that parties purged themselves of wrongdoing when they reached a settlement with another party).

[¶19.]        The only discoverable case which applies this doctrine in the context of restrictive covenants is Stewart v. Jackson, 635 NE2d 186 (IndCtApp 1994).  In that case, the plaintiffs sought to preclude their neighbors from operating a home day

care by invoking covenants barring both nonresidential and commercial uses of property. *Id.* at 188. The plaintiffs had previously operated two businesses in their home, and they admitted doing so violated the covenants. *Id.* at 188-89. The court found, however, that the plaintiffs purged their wrongdoing by ceasing business operations in their home. *Id.* at 190.

[¶20.]     In this case, Halls admitted that he placed a motor home on his Pine Haven lot on a temporary basis, and he testified that his adjoining landowners agreed to his action. Halls admitted, however, that he did not get Shelstead's approval, even though Shelstead owned most of the Pine Haven lots at that time. Halls never admitted his actions violated the covenants, but like the plaintiff in *Stewart*, he quit violating the restrictive covenants. Halls' offensive act was committed and remedied long before the issue in this case arose. Under the facts of this case, we cannot say that the trial court abused its discretion by not precluding Halls from seeking equitable relief.

[¶21.]     Whites' other arguments challenging the validity and enforceability of the covenants are without merit. We reverse and remand for the trial court to enter a permanent injunction in conformity with this opinion.

[¶22.]     GILBERTSON, Chief Justice, and SABERS and KONENKAMP, Justices, and WILBUR, Circuit Judge, concur.

[¶23.]     WILBUR, Circuit Judge, sitting for ZINTER, Justice, disqualified.