490 S.E.2d 778

**Lestel COTTRILL, Petitioner Below, Appellant,**

v.

**B.L. RANSON and Rosalie E. Ranson, his Wife, and the Board of Education of Putnam County, a Corporation Created by West Virginia State Law, Respondents Below, Appellees.**

**No. 23374.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 28, 1997.

Decided July 15, 1997.

---

Robert W. Friend, Parkersburg, for Lestel Cottrill.

John H. Reed III, Reed & Reed, Hurricane, for B.L. and Rosalie E. Ranson.

WORKMAN, Chief Justice:

The petitioner below and Appellant herein, Lestel Cottrill (hereinafter Appellant), appeals the final order of the Circuit Court of Putnam County entered on July 11, 1995.

This order affirmed the circuit court's prior summary judgment order dated August 23, 1994, in favor of the sale and purchase of a piece of property between the respondents below and Appellees herein, the Board of Education of Putnam County (hereinafter the BOE) and B.L. and Rosalie E. Ranson (hereinafter the Ransons). For the following reasons, we affirm the final order of the circuit court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Appellant and his brother, Otho Vearl Cottrill, owned three parcels of land (collectively referred to as the parent tracts) located in Putnam County, West Virginia. Appellant and his brother owned a joint interest in parcels one and three, while Appellant owned a two-thirds interest and his brother a one-third interest in parcel two.[1] On May 6, 1950, Appellant and his wife and his brother and his brother's first wife, Hattie Cottrill, conveyed by a general warranty deed approximately two acres of property to the BOE for $900.[2] The BOE built an elementary school on the property.

On November 26, 1951, Appellant and his wife conveyed their interest in the parent tracts by general warranty deed to Appellant's brother and Hattie Cottrill. On April 19, 1967, Appellant's brother and his second wife, Emma Cottrill,[3] conveyed the parent tracts by general warranty deed to the Ransons. Appellant's brother subsequently died and by will devised and bequeathed all his estate to Emma Cottrill, provided she survived him for a period of sixty days. In the event she did not survive him for a period of sixty days, Appellant's brother devised and bequeathed his entire estate to Appellant.

In 1991, the BOE decided it no longer wanted the property for school purposes and put the property up for auction. Both Appellant and the Ransons sought title to the property pursuant to West Virginia Code § 18–5–7 (1949).[4] In relevant part, this statute provides:

> **Disposal of School Property; Oil and Gas Leases.**—If at any time the board shall ascertain that any building or any land no longer shall be needed for school purposes, the board may sell, dismantle, remove or relocate any such buildings and sell the land on which they are located, at public auction, after proper notice, and on such terms as it orders, to the highest responsible bidder. *But in rural communities the grantor of the lands, his heirs or assigns, shall have the right to purchase at the sale, the land,* exclusive of the buildings thereon, and the mineral rights, *at the same price for which it was originally sold.*

W. Va.Code § 18–5–7 (emphasis added). The BOE refused to sell the property to either Appellant or the Ransons until a judicial determination could be made of who was entitled to the property.

Appellant filed a petition with the circuit court requesting, inter alia, that he be given the right to repurchase the property as an original grantor of the property to the BOE and as the heir of the other grantor, his brother. The Ransons, who now have owned the parent tracts for the past thirty years, responded and filed a declaratory judgment action with the circuit court, arguing they should be granted the sole right to repurchase the property because they are the assigns of the parent tracts and neither Appellant nor his brother preserved their rights to repurchase the BOE property in their respective assignments of those tracts. After responses were filed by both the BOE and Appellant, the Ransons filed a motion for

---

**1.** These three parcels are described as containing approximately 42, 81, and 1.6 acres respectfully. From this acreage certain outconveyances were made.

**2.** Appellant's wife and Hattie Cottrill joined in the conveyance to eliminate their dower interests.

**3.** Hattie Cottrill died, and her property passed to her husband.

**4.** The circuit court determined the 1949 version of West Virginia Code § 18–5–7 applies to this case because that version of the statute was in effect when the property was conveyed to the BOE on May 6, 1950.

summary judgment. Appellant did not file any opposing affidavit, but a hearing was held on April 7, 1994, at which Appellant testified.

On August 23, 1994, the circuit court entered its initial order finding no genuine issue of material fact existed. The circuit court also concluded the Ransons are the "assigns" within the meaning and context of West Virginia Code § 18–5–7 and are entitled to repurchase the BOE property pursuant to that statute. The circuit court, therefore, granted summary judgment in favor of the Ransons.

Appellant filed motions with the circuit court "to make specific findings of fact and/or alter or amend its findings and/or judgment or for a new trial." Appellant presented the circuit court with a deed which Appellant asserts gives him a mineral interest in the property owned by the BOE and a photocopy of his brother's will. Appellant attached to the will an affidavit stating that Emma Cottrill did not survive his brother and all interest his brother possessed in any real estate was devised to Appellant.[5]

In its order entered on July 11, 1995, the circuit court affirmed its prior order and stated that any issues or facts raised subsequent to the first order were not timely and, even if timely, would not change the ultimate decision. The circuit court found, inter alia, that Appellant failed to provide it with a certified copy of his brother's will and failed to provide documentation to show that Emma Cottrill did not survive her husband for a period of sixty days, which was a prerequisite to make the devise to Appellant effective. Regardless, the circuit court determined Appellant's brother did not have any interest in the parent tracts or the two acres conveyed to the BOE, "with the possible exception of an interest in the minerals underlying the 81 acre tract residue (one of the three 'parent tracts')," and it could not "determine from the evidence presented that

the school lot was a part of the 81 acre tract."[6]

## II.

## DISCUSSION

### A.

### Summary Judgment

■ As we repeatedly have said, " '[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992). We review a circuit court's decision to grant summary judgment de novo and apply the same standard for summary judgment that is to be followed by the circuit court. *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 58, 459 S.E.2d 329, 335 (1995) (citations omitted). As we stated in syllabus point two of *Williams:*

> Summary judgment is appropriate if, from the totality of the evidence presented, the record could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove.

Syl. Pt. 2, *Williams.* We will reverse a circuit court's award of summary judgment if there is a genuine issue of material fact to be resolved or if, as a matter of law, the moving party is not entitled to the judgment. 194 W.Va. at 60, 459 S.E.2d at 336. In this case, we find no reversible error.

---

5. According to the petition filed in the circuit court, Appellant's wife also is deceased, and Appellant has not remarried.

6. On appeal, Appellant does not make any argument in his brief or reply brief that he should be

entitled to repurchase the BOE property because of his alleged one-third ownership of the mineral rights under the 81 acre tract. Therefore, we decline to address this issue.

## B.

## Analysis

Appellant argues the Ransons are being unjustly enriched by the circuit court's order because an assignment of the right to repurchase the BOE property was not contemplated when the parent tracts were conveyed. Thus, as an original grantor of the property and as the heir of his brother's interest in the property, Appellant asserts he should be entitled to repurchase the land. On the other hand, the Ransons contend the right to repurchase followed the land from which it was annexed because neither Appellant and his wife nor Appellant's brother and Emma Cottrill excepted the right to repurchase out of their conveyances of the parent tracts. Therefore, the Ransons assert they are the only ones who now possess the right to repurchase the property.

Over one hundred years ago, this Court stated in dicta that Section 33 of Chapter 45 of the West Virginia Code (the predecessor to West Virginia Code § 18–5–7), was enacted as "a concession ... to those living in farming communities, that a small portion of a farm may not be taken for school-purposes and then be allowed to pass into the hands of a stranger, to the damage of the residue of the land...." *Carper v. Cook,* 39 W.Va. 346, 351, 19 S.E. 379, 381 (1894).[7] At the time *Carper* was decided, Section 33 of Chapter 45 provided that only a "grantor or his heirs" may seek reconveyance of a schoolhouse site, and there was no right of reconveyance given to an assign. 1881 W. Va. Acts ch. 15, § 33. In 1905, however, the right of reconveyance was abolished entirely when the statute was amended. 1905 W. Va. Acts ch. 70, § 33.

In discussing the purpose of the statute before the 1905 amendment was made, this Court in 1913 quoted the above language

from *Carper. Cavendish v. Blume Coal & Coke Co.,* 72 W.Va. 643, 646, 78 S.E. 794, 796 (1913). Although we found the statute did not apply in *Cavendish* because the schoolhouse site in question was located in a "village," we questioned, but left unresolved, whether a conveyance of the parent tract "carr[ied] with it the right of reconveyance given by the statute." *Id.* at 647–48, 78 S.E. at 796. Thereafter, in 1919, the statute was amended again, and language similar to the 1881 version was reinserted into the statute.[8] *Compare* 1881 W. Va. Acts ch. 15, § 33, *with* 1919 W. Va. Acts ch. 2, § 48. One important difference in the relevant language, however, was that the 1919 version gave the grantor's "heirs or assigns" the right to repurchase the land.[9]

The next amendment to this particular language occurred in 1933, and this language was in effect when Appellant, his brother, and their wives conveyed the property to the BOE in 1950. *Compare* W. Va.Code § 18–5–7 (Supp.1933), *with* W. Va.Code § 18–5–7 (1949).[10] The 1933 revision provided, in part, that "in rural communities the grantor of the lands, his heirs or assigns, shall have the right to purchase at the sale, the land, exclusive of the buildings thereon, and the mineral rights, at the same price for which it was originally sold." Thus, at the time the conveyance was made to the BOE in the present case, the right to repurchase was clearly an inheritable and assignable right under the statute. The question we must resolve then is the one left open in *Cavendish,* that is, whether the right to repurchase followed the sale of the parent tract and became the right of the Ransons.

 In deciding this issue, we adhere to the view previously expressed by this Court that one of the underlying purposes of West

---

7. In *Carper,* we found the plaintiffs did not even demonstrate a right to have the property owned by the school board reconveyed pursuant to the statute. *Id.*

8. An amendment also was made in 1908, but it is not relevant to the present issue. *See* 1908 W. Va. Acts ch. 27, § 10.

9. In relevant part, the 1919 version of the statute stated that, if a schoolhouse site is to be sold, "in rural districts *the grantor of such lands, his heirs*

*or assigns,* shall have the right, at such sale, to purchase said land, exclusive of mineral rights, and buildings thereon, at the same price for which it was sold, plus legal interest." 1919 W. Va. Acts ch. 2, § 48 (emphasis added).

10. Amendments were made to the statute in 1947 and 1949, but they are not relevant to the present case. *See* W. Va.Code § 18–5–7 (Supp.1947); W. Va.Code § 18–5–7 (1949).

Virginia Code § 18–5–7 is to assure rural property owners that, if they convey a portion of their land to be used for school purposes and if school operations on the property later cease, the original grantor of the school property, his heirs or assigns, may repurchase the school property to prevent it from passing into the hands of a stranger and, thereby, protect the parent tract from being damaged. In order to accomplish this purpose, we conclude whatever right the original grantor has to repurchase the school property will pass from the original grantor to that grantor's heirs or assigns of the parent tract so that such heirs or assigns may repurchase the school property and protect the parent tract which they own by virtue of the conveyance from the original grantor. This conclusion is supported by our more recent opinion of *Stephens v. Raleigh County Board of Education,* 163 W.Va. 434, 257 S.E.2d 175 (1979).

The primary issue in *Stephens* was the definition of the phrase "rural community" as used in West Virginia Code § 18–5–7. *Id.* at 435, 257 S.E.2d at 177.[11] In defining that phrase, we again quoted the dicta in *Carper* and further stated:

> [T]he thrust of the statute was a protection of farm interests. The repurchase privilege was designed to protect the interests associated with rural estates; that is, the preservation of "home places" and operative agricultural units. The statute was not intended to preserve unto future generations a windfall profit realized because of adjacent development.

*Id.* at 440, 257 S.E.2d at 179. Consequently, we determined in *Stephens* that, if the area is subdivided or arranged for development or lot sale, the requirements of a "rural community" under the statute would not be met and no legitimate interest or goal would be served by allowing the right to repurchase. *Id.*

Importantly, we also discussed in *Stephens* whether the statute denied equal protection of the law to certain persons. *Id.* at 442–44, 257 S.E.2d at 180–81. Concededly, the statute grants a benefit to those living in rural communities that it does not grant to those living in non-rural communities. However, applying the rational basis test, we found the statute does not violate equal protection because this State historically has encouraged rural and agricultural pursuits. *Id.*

In footnote twelve of *Stephens,* we stated another important objective of the statute is to "facilitate[ ] the acquisition of school property on agreeable terms, at a reasonable price, thus benefitting the educational system and the public as a whole." *Id.* at 444 n. 12, 257 S.E.2d at 181 n. 12.[12] Appellant points to this language in support of his position, arguing that, if an assign is able to repurchase the land, it would not facilitate the original sale of the land by the grantor in the first instance. We disagree.

First, Appellant's position would make the term "assigns" meaningless if "assigns" could not repurchase the property, and it would be directly contrary to the plain language of the statute, providing that "assigns[ ] shall have the right to purchase" such land. W. Va.Code § 18–5–7. This Court's responsibility is to give effect, whenever possible, to every word in a statute and not distort the plain language contained therein. *See West Virginia Human Rights Comm'n v. Garretson,* 196 W.Va. 118, 123, 468 S.E.2d 733, 738 (1996) (stating "[a] statute is interpreted on the plain meaning of its provision in the statutory context, informed when necessary by the policy that the statue was designed to serve"); *Bullman v. D & R Lumber Co.,* 195 W.Va. 129, 133, 464 S.E.2d 771, 775 (1995) (providing "every word used is presumed to have meaning and purpose, for the Legislature is thought by the courts not to have used language idly"). Therefore, we will permit "assigns" to repurchase the

---

11. In the final order of the present case, the circuit court found that the property lies in a "rural community" within the meaning of the statute.

12. Although it may be said that this objective, by itself, would be insufficient to constitutionally differentiate between rural and non-rural property owners, we need not labor on this point because we previously have held the statute is rationally related to this State's agricultural pursuits. *See id.*

property under the clear language of the statute.

■ Second, there is nothing to prevent the grantor from negotiating with a purchaser for some type of compensation in exchange for the right to repurchase, if such right should ever materialize.[13] As many people freely take risks in everything from the lottery to the futures market, a purchaser may well be willing to pay a higher price or give the grantor some other benefit, speculating that the school board someday may want to sell the property. If nothing else, it may make the parent tract more salable if a prospective purchaser of the grantor knows the parent tract can be protected if the BOE should ever decide to sell the property.

In spite of our prior decisions, Appellant argues that "[t]he purpose of the statute was to encourage the donation of land for school purposes, not to keep farms intact." If we would adopt Appellant's view, however, it not only would be contrary to what we historically have said about the purpose of the statute (protecting rural and agricultural pursuits), but it also would raise concern that the statute unconstitutionally discriminates between rural and non-rural property owners under the equal protection clause.[14] We have stated that " '[w]herever an act of the Legislature can be so construed and applied as to avoid a conflict with the Constitution, and give it the force of law, such construction will

be adopted by the courts.' Syllabus Point 3, *Slack v. Jacob*, 8 W.Va. 612 (1875)." Syl. Pt. 1, *Perilli v. Board of Education*, 182 W.Va. 261, 387 S.E.2d 315 (1989); *see also* Syl. Pt. 1, *Adkins v. Miller*, 187 W.Va. 774, 421 S.E.2d 682 (1992) (quoting same syllabus point). Thus, we reject Appellant's argument.

■ Adhering to the principle that the right to repurchase follows the parent tracts, we next look to the language of the deeds themselves to determine whether Appellant or his brother attempted to except the right to repurchase from their respective conveyances of the parent tracts. At the outset, we recognize that a conveyance or devise of any real property, containing no words of limitation, "*shall be construed* to pass the fee simple, or the whole estate *or interest, legal or equitable*, which the testator or grantor had power to dispose of, in such real property, unless a contrary intention shall appear in the conveyance or will." W. Va.Code § 36–1–11 (1985) (emphasis added).[15] We have made it clear that "[i]n order to create an exception or reservation in a deed which would reduce a grant in a conveyance clause which is clear, correct and conventional, such exception or reservation must be expressed in certain and definite language." Syl. Pt. 2, *Hall v. Hartley*, 146 W.Va. 328, 119 S.E.2d 759 (1961).[16] We also

---

**13.** In this case, the statute provides it is the BOE's decision as to whether or not the property should be sold, making the right to repurchase analogous to a pre-emptive right. *See* W. Va. Code § 18–5–7. "A pre-emptive right involves the creation of the privilege to purchase only on the formulation of a desire on the part of the owner to sell...." Syl. Pt. 1, *Smith v. VanVoorhis*, 170 W.Va. 729, 296 S.E.2d 851 (1982). Sometimes referred to as a "right of first refusal," someone holding a pre-emptive right cannot compel an unwilling owner to sell. A pre-emptive right merely entitles the rightholder to purchase the property if it is put up for sale. Upon notice to the rightholder that the property is for sale, the right becomes an "option." Syl. Pts. 2, 3, and 5, *John D. Stump & Assoc. v. Cunningham Mem. Park, Inc.*, 187 W.Va. 438, 419 S.E.2d 699 (1992).

**14.** *See supra* note 12; *Stephens*, 163 W.Va. at 442–44, 257 S.E.2d at 180–81.

**15.** *See also* W. Va.Code § 36–3–10 (1985) ("Every deed conveying land shall, unless an excep-

tion be made therein, be construed to include all ... privileges[ ] and appurtenances of every kind belonging to the lands therein embraced.").

**16.** Although the terms "exception" and "reservation" often are used synonymously, they are distinguishable. *Erwin v. Bethlehem Steel Corp.*, 134 W.Va. 900, 914, 62 S.E.2d 337, 345 (1950) (citations omitted). An exception exists when the grantor "withdraws from the operation of the conveyance some part of the thing granted, which but for the exception would have passed to the grantee under the general description...." *Id.* at 915, 62 S.E.2d at 346 (internal quotation and citation omitted). On the other hand, a reservation is made when the grantor creates "some new thing to himself issuing out of the thing granted, and not [before] in *esse* ...." *Id.* (internal quotations and citations omitted). As the right to repurchase was not something newly created but would pass together with the parent tracts, we use the term exception rather than reservation.

have said " '[w]here there is ambiguity in a deed, or where it admits of two constructions, that one will be adopted which is most favorable to the grantee.' Pt. 6, syllabus, *Paxton v. Benedum–Trees Oil Co.*, 80 W.Va. 187[, 94 S.E. 472 (1917) ]." Syl. Pt. 3, *Hall.*

■ Upon examining the deed dated November 26, 1951, conveying the parent tracts from Appellant and his wife to his brother and Hattie Cottrill, we can find no language excepting out the right to repurchase from the conveyance. In fact, the property conveyed to the BOE is not even specifically mentioned in the deed, and the deed provides, in relevant part, that Appellant and his wife "GRANT[ED] and CONVEY[ED] ... *all of their right, title, and interest* in and to [the] three (3) parcels of land [the parent tracts], *together with the improvements thereon and the appurtenances thereunto belonging ...*" by a general warranty deed. (Emphasis added). Thus, we conclude Appellant assigned the right to repurchase the BOE property to his brother and Hattie Cottrill when the preceding conveyance was made.

■ When Appellant's brother and Emma Cottrill conveyed the parent tracts to the Ransons, however, different language was used in the deed conveying the property. This deed states, in part: "There is ... excepted and reserved from the force and effect of this deed the following tracts or parcels of real estate which have been conveyed from the original tracts." Listed on the deed are five conveyances made from the original tracts. One of those conveyances is the two acres of land granted to the BOE.

In its order entered on July 11, 1995, the circuit court found the parent tracts were set forth therein by the same metes and bounds

description as existed in previous deeds and the description was not changed to reflect the conveyances made out of the original parent tracts. Therefore, the circuit court concluded the conveyances merely were listed on the deed as a means to describe the property actually being conveyed and Appellant's brother and Emma Cottrill did not retain the right to repurchase the property from the BOE. On the other hand, Appellant argues that the above language in the deed deprives the Ransons of any interest in the BOE property and, thus, the Ransons do not posses the right to repurchase the same.

After examining the deed, we find the circuit court's conclusion is correct. As the metes and bounds descriptions of the parent tracts are given as if they were being conveyed in their entirety, the outconveyances referenced on the deed are listed to clarify precisely what was being conveyed. In fact, immediately after the five conveyances are listed on the deed, the drafter of the deed recalculated the amount of acreage being conveyed to reflect the reduction for the outconveyances.[17]

■ In addition, we also find the language used by Appellant's brother and Emma Cottrill was inadequate to except the right to repurchase from the deed to the Ransons. Although the language "except[s] and reserve[s] from the force and effect of this deed" the property conveyed to the BOE, it does not mention anything about the right to repurchase. As we said in syllabus point two of *Hall*, an exception must be certainly and definitively expressed in the deed. The foregoing language clearly does not meet this standard. Even if we concluded the language is ambiguous and two possible interpretations exist, one conveying the right to repurchase and one excepting the

---

17. As previously mentioned, there originally were three parcels of land containing 42 acres, 81 acres, and 1.6 acres, more or less. The deed to the Ransons provides that the five outconveyances included, more or less, 4⅛ acres, 2 acres, 29 acres, 4 acres, and ⅓ mineral interests underlying one of the tracts. After describing the three parcels by their original acreage and listing the outconveyances from those parcels, the deed to

the Ransons states the parcels being conveyed contained 38 acres, 44 acres, and 1.6 acres, more or less. We realize that there is 1⅞ acres unaccounted for in the deed. On the record before us, we cannot determine whether there was a mathematical error made by the drafter of the deed in calculating the acreage conveyed or if there was an outconveyances inadvertently omitted from the deed.

right to repurchase, the ambiguity will be construed in favor of the Ransons and Appellant's argument still fails. *See* Syl. Pt. 3, *Hall.*[18] Consequently, we conclude that the Ransons qualify as the "assigns" within the meaning of West Virginia Code § 18-5-7 (1949) and, therefore, they may repurchase the BOE property pursuant to that statute.[19]

### III.

### CONCLUSION

For the foregoing reasons, we affirm the circuit court's final order awarding summary judgment in favor of the Ransons.[20]

Affirmed.

**18.** Upon finding that Appellant's brother and Emma Cottrill assigned their right to repurchase the BOE property to the Ransons, Appellant's argument that he is the "heir" of his brother is hereby moot.

**19.** Technically, the Ransons obtained only a fractional interest of the right to repurchase. As neither the heir nor assign of Appellant, the Ransons could not acquire Appellant's interest, and such interest expired upon the death of Appellant's brother. The Ransons only could receive the interest Appellant's brother had as a grantor of the BOE property. *See e.g. Lane v. Board of Educ. of Lincoln County*, 147 W.Va. 737, 744, 131 S.E.2d 165, 170 (1963) (finding West Virginia Code § 18-5-7 does not extend the right to repurchase to the heirs of the heirs of the grantor). Moreover, if the statute permitted the right to repurchase to pass endlessly from assign to assign or heir to heir, it would violate the rule against perpetuities. *See e.g.* Syl. Pt. 2, *Smith* (holding "[a] pre-emptive right is a sufficient executory interest to make it subject to the rule against perpetuities").

As no other party holds a fractional interest in the right to repurchase pursuant to the statute,

we permit the Ransons to buy the entire lot to satisfy the underlying purpose of the statute. In cases involving two or more parties holding fractional interests in the right to repurchase, a different result may be warranted.

**20.** In support of their position, the Ransons cite several opinions issued by the West Virginia Attorney General's Office interpreting and applying West Virginia Code § 18-5-7. *Citing* 56 Att'y Gen. Rep. No. 81 (October 3, 1975); 51 Att'y Gen. Rep. No. 7 (July 28, 1964); 45 Att'y Gen. Rep. No. 103 (March 12, 1953); 43 Att'y Gen. Rep. No. 197 (November 30, 1949); 42 Att'y Gen. Rep. No. 69 (July 9, 1947). We have examined these opinions and many others issued by the Attorney General's Office and, for the most part, find they generally are consistent with our holding today. We notice, however, there are several issues addressed in those opinions which are not relevant to the present appeal. We make no decisions or comments with respect to those matters not specifically addressed by our opinion today.