557 S.E.2d 294

**Ernest Dale CARR and Wanda M. Carr, His Wife; Howard Double and Bertha Double, His Wife; and James Wilson Douglas and Rita Jo Douglas, His Wife, Petitioners Below/Appellants,**

v.

**MICHAEL MOTORS, INC. Respondent Below/Appellee.**

No. 29334.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 2, 2001.

Decided Nov. 28, 2001.

James Wilson Douglas, Sutton, West Virginia, Attorney for Appellants.

Bernard R. Mauser, Sutton, William C. Garrett, Elizabeth G. Farber, Gassaway, West Virginia, Attorneys for Appellee.

DAVIS, Justice:

This appeal was filed by Ernest Dale Carr, Wanda M. Carr, Howard Double, Bertha Double, James Wilson Douglas and Rita Jo Douglas, appellants/plaintiffs below (hereinafter collectively referred to as the "Carrs"), challenging two summary judgment orders from the Circuit Court of Braxton County. The Carrs initiated this action against Michael Motors, Inc., appellee/defendant below (hereinafter referred to as "Michael Motors"), regarding Michael Motors' activities relating to two parcels of land. Based upon the parties' arguments on appeal, the record designated for appellate review, and the pertinent authorities, we reverse the decision of the Circuit Court of Braxton County.

## I.

## FACTUAL AND PROCEDURAL HISTORY

This appeal involves claims made as to two parcels of land, the Carpenter property and the Sergent property, and claims for damages allegedly resulting from activities on one of the two parcels. To fully understand the issues, we discuss separately the various land claims and damages claim.

### A. Carpenter Property

The Carpenter property consisted of 9 acres situate in the Holly District of Braxton County. In 1956, Helene Davis deeded the 9 acres to Ernest and Mabel Carpenter. The Carpenter's deed contained a restriction that prohibited erecting any building within 100

feet of a maple tree that was near the Davis residence.[1]

Michael Motors purchased the 9 acre Carpenter property in 1999. Subsequent to purchasing the Carpenter property, Michael Motors developed the land for commercial use. One tract of the property was sold to and is being used by a brake service company. On June 12, 2000, the Carrs filed an amended complaint seeking to prevent Michael Motors from using the Carpenter property for commercial use.[2]

Both parties moved for summary judgment. By order entered October 19, 2000, the circuit court granted summary judgment to Michael Motors. The circuit court concluded that the restriction in the Carpenter's deed did not preclude the erection of commercial buildings.

### B. Sergent Property

The Sergent property consisted of 84 acres also situate in the Holly District of Braxton County. In April 1977, Vivian, James and Sue B. Sergent sold the Sergent property to Butler Real Estate, Inc. No restrictive covenants were placed in the deed pursuant to the sale. In May of 1977, Butler Real Estate sold 11.47 acres of the Sergent property to the Doubles. The deed to the Doubles contained the following relevant restriction: "Said premises shall be solely and strictly used for residential purposes and not commercial or industrial purposes, but shall not include any type of trailer, mobile or modular home."

In 1990, the Douglas' purchased approximately 4.01 acres of the Sergent property, which purchase was subject to the restrictions in the Doubles' deed. In 1994, the Carrs purchased 2.52 acres of the Sergent property, subject to the restrictions in the Doubles' deed. In 1999, Michael Motors purchased several tracts of the Sergent property, which purchase was subject to the restrictions contained in the Doubles' deed.[3]

Michael Motors prepared its Sergent property for residential use, and placed two residential buildings, called Grafton homes, on the land. During the construction of these two buildings, the Carrs filed their amended complaint. The Carrs sought to prevent Michael Motors from erecting the Grafton homes as the buildings were characterized as modular homes.

Both parties moved for summary judgment. The circuit court granted Michael Motors' motion for summary judgment concluding that the Grafton homes were "manufactured homes," not "modular homes."

### C. Tort Damage Claims

The Carrs alleged tortious conduct by Michael Motors with regard to its activities on the Sergent property. In this respect, the amended complaint alleged damage to a "water pond" belonging to the Doubles. There was also an allegation of damage to the Carrs' "dwelling and out-buildings." Neither party moved for summary judgment on the tort claims. However, the circuit court granted summary judgment to Michael Motors on the tort claims.

## II.

### STANDARD OF REVIEW

The Carrs appeal from two orders granting summary judgment to Michael Mo-

---

1. The following is the language of the restriction in the deed:

   As a part of the consideration hereof, and as a covenant running with the land hereby conveyed, no building shall be erected on the lower portion of said tract of land, and no building shall be located specifically starting on the lower end of said tract, that being the portion next to Laurel Fork, and going up to a maple tree, and including a distance of 100 feet above said maple tree toward Newville, but this provision shall not restrict in any way the parties of the second part, their heirs or assigns from erecting any buildings which they may so desire upon the upper portion of said tract of land and specifically on the upper portion at least 100 feet above said large maple

   tree, which large maple tree stands almost opposite the dwelling house of the party of the first part where she is now residing on said tract of land of which a part is hereby conveyed. This restriction of building as aforesaid shall apply to the heirs and assigns of the parties of the second part.

2. Initially, a complaint was filed only by the Douglas' in February of 2000. Thereafter, the Carrs and Doubles were allowed to intervene. The amended complaint was filed after the Carrs and Doubles intervened.

3. Neither the Carrs, the Douglases, nor Michael Motors obtained their Sergent property from Butler Real Estate.

tors. We have held that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). In our review of a circuit court's decision regarding summary judgment, we apply the same standard required of the circuit court. *See Cottrill v. Ranson,* 200 W.Va. 691, 695, 490 S.E.2d 778, 782 (1997) ("We review a circuit court's decision to grant summary judgment de novo and apply the same standard for summary judgment that is to be followed by the circuit court)." (citing *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 58, 459 S.E.2d 329, 335 (1995)). In this regard, we have long held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).

## III.

## DISCUSSION

### A. *Summary Judgment on the Carpenter Property.*

The Carrs argue that the trial court committed error by concluding that the Carrs had no "standing to enforce the Davis–Carpenter restrictive covenant by virtue of not having been the original parties thereto, or successors in interest to the original parties." The Carrs rely on this Court's decision in *Allemong v. Frendzel,* 178 W.Va. 601, 363 S.E.2d 487 (1987), to assert standing to enforce the restrictive covenant in the Carpenter's deed.

The decision in *Allemong* arose from an appeal of a circuit court ruling which enjoined the defendants from selling alcoholic beverages on their property, because such use violated a restrictive covenant prohibiting the sale of alcoholic beverages on the premises. In *Allemong,* it was argued that the plaintiffs were not parties to the deed that imposed the restrictive covenant. Therefore, it was contended that the plaintiffs had no standing to enforce the covenant. This Court disagreed and affirmed the in-

junction. In so doing, the following principle of law was enunciated in syllabus point 1 of *Allemong:*

> A valid restrictive covenant may be enforced by one other than a party to the restrictive covenant provided that the parties to the deed in which the restrictive covenant originated intended that the restriction should benefit the land of the person claiming enforcement.

*Allemong* grants standing to a land owner to enforce a restrictive covenant, even though he or she was not a party to the restrictive covenant, if it can be established that the covenant makers intended the covenant to benefit the non-covenant maker's land. The opinion in *Allemong* acknowledged, and we now hold that the question of who is entitled to the benefit of a restrictive covenant and, therefore, has standing to enforce the covenant "is ultimately a question of fact." *Allemong,* 178 W.Va. at 604, 363 S.E.2d at 490. We hold further that the intent of a covenant maker as to who the covenant is intended to benefit, " 'may be ascertained from the language of the conveyances alone or from that language together with other evidence of intent.' " *Id.* (quoting *Gnau v. Kinlein,* 217 Md. 43, 48, 141 A.2d 492, 495 (1958)).

In the instant proceeding, the trial court reviewed the Carpenter deed and concluded that the restrictive covenant was not intended to benefit the Carrs' property. In making this determination the trial court erroneously limited the scope of the restrictive covenant as follows:

> When one examines the clear and unambiguous language of the deed from Helene Davis to Ernest and Mabel Carpenter, it is evident that it was the intent of the grantor, Helene Davis, to prohibit the construction of building within 100 feet of a maple tree that was directly opposite her dwelling house. The deed did not contain any language prohibiting any commercial use or the construction of any building on any other portion of the premises. The grantor did not want any building within a certain distance of her house and did not express any desire that she sought to re-

strict the use of the property as that use might affect any adjoining owners.

In our review of the language of the restrictive covenant we do not find that the deed only limited the erection of buildings within 100 feet of a maple tree. The deed restricted building anything on "the lower portion of the property" and 100 feet above a maple tree. The pertinent language of the covenant states: "[N]o building shall be erected on the lower portion of said tract of land, and no building shall be located specifically starting on the lower end of said tract, that being the portion next to Laurel Fork, and going up to a maple tree, and including a distance of 100 feet above said maple tree[.]"

The plain meaning of the language contained in this restrictive covenant reveals that the trial court erroneously limited its scope in order to reach the conclusion that the Carrs did not have standing to enforce the covenant. Insofar as the deed prohibited the erection of any building on the lower portion of the property and 100 feet above a maple tree, we believe that the expansive scope of the covenant established a disputed material issue of fact as to whether the deed maker intended the covenant to benefit surrounding property. Therefore, summary judgment was inappropriate and the issue of the deed maker's intent must go to the jury.[4]

### B. Summary Judgment on the Sergent Property

Next, the Carrs assert that a restrictive covenant in the deed to the Sergent property prohibited the erection of modular homes. The Carrs further contend that the trial court committed error in determining that the two Grafton homes erected on the Sergent property were not modular homes within the meaning of the deed.

The circuit court ruled that the term modular home was not defined in the deed and therefore looked to several sources outside the deed for clarification. We have recognized that "where the intent of the parties is clearly expressed in definite and unambiguous language on the face of the deed itself, the court is required to give effect to such language and, ordinarily will not resort to parole or extrinsic evidence." *Pocahontas Land Corp. v. Evans*, 175 W.Va. 304, 308, 332 S.E.2d 604, 609 (1985) (citations omitted). However, when ambiguity is found in a deed we have held that "[t]he polar star that should guide us in the construction of deeds . . . is, what was the intention of the party or parties making the instrument, and when this is determined, to give effect thereto, unless to do so would violate some rule of property." *Totten v. Pocahontas Coal & Coke Co.*, 67 W.Va. 639, 642, 68 S.E. 373, 374 (1910). *See also Meadows v. Belknap*, 199 W.Va. 243, 248, 483 S.E.2d 826, 831 (1997).

In determining what meaning to attach to the term modular home, the circuit court utilized the decision of this Court in *Billings v. Shrewsbury*, 170 W.Va. 414, 294 S.E.2d 267 (1982). The Carrs contend that *Billings* does not apply. *Billings* involved the determination of whether a factory built home was a mobile home. We agree with the Carrs. *Billings* is factually distinguishable and should not have been relied upon by the circuit court.[5]

---

4. As an alternative basis for granting summary judgment, the circuit ·court found that "the Davis property retained was condemned for public use by the United States government and the dwelling house on the Davis property is no longer in existence and the purpose for which the restrictive covenant was recited is no longer in existence" We have "recognized the commonly accepted legal proposition that changes in a neighborhood's character can nullify restrictive covenants affecting property within the neighborhood." *Allemong*, 178 W.Va. at 606, 363 S.E.2d at 492 (citations omitted). However, "[c]hanged conditions of the neighborhood will not be sufficient to defeat [enforcement of a restrictive covenant] unless the changes are so radical as practically to destroy the essential

objects and purposes of the agreement." *Wallace v. St. Clair*, 147 W.Va. 377, 399, 127 S.E.2d 742, 757 (1962) (internal quotations and citations omitted). We believe that the trial court invaded the province of a jury in its interpretation of facts concerning changed conditions on the property.

5. In addition to being factually distinguishable, *Billings* is inapplicable. *Billings* was construing a definition contained in the state's Mobile Home Safety Act, which was repealed in 1988 and replaced with the Manufactured Housing Construction and Safety Standards Act. Both Acts are discussed in the body of this opinion.

The circuit court also considered the statutory meaning of "modular home" as found in W. Va.Code § 37–15–2(i) (1993) (Repl.Vol. 1997),[6] and the definition of "manufactured home" found in W. Va.Code § 21–9–2(j) (1992) (Repl.Vol.1996).[7] In so doing, the circuit court concluded that the Grafton homes met the statutory definition of manufactured homes, based upon the following: [8]

> As set forth in the findings of fact, this Court finds that these "Grafton homes" are clearly "manufactured homes" within the meaning of the laws of the State of West Virginia and as such are not "modular homes."

> As shown by the petitioners' photographs, these structure[s] were transported in segments, do not have wheels and chassis as a part of their components, but are transported upon trailers, the components were significantly unfinished when moved to the site, a crane was used to place the components upon the permanent foundation, and at least one of the units consists of components that when assembled made it a two-story, single family dwelling, in addition to the full basement.

**6.** The term "modular home" is defined in W. Va.Code § 37–15–2(i) (1993) (Repl.Vol.1997) as follows:

"Modular home" means any structure that is wholly, or in substantial part, made, fabricated, formed or assembled in manufacturing facilities for installation or assembly and installation on a building site and designed for long-term residential use and is certified as meeting the standards contained in the state fire code encompassed in the legislative rules promulgated by the state fire commission pursuant to section five-b, article three, chapter twenty-nine of this code.

**7.** The term "manufactured home" is defined in W. Va.Code § 21–9–2(j) as follows:

"Manufactured home" means a structure, transportable in one or more sections, which in the traveling mode is eight body feet or more in width or forty body feet or more in length or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning and electrical systems contained therein; except that such term shall include any structure which meets all the re-

No prior case has required this Court to examine the statutes concerning the definitions of manufactured homes and modular homes. We now take the opportunity to do so.

In order to understand the statutory meaning attached to the terms "manufactured home" under W. Va.Code § 21–9–2(j) and "modular home" under W. Va.Code § 37–15–2(i), we must also examine the meaning assigned to the term "mobile home" under W. Va.Code 37–15–2(h).[9] *See* Syl. pt. 1, *Owens–Illinois Glass Co. v. Battle*, 151 W.Va. 655, 154 S.E.2d 854 (1967) ("Statutes relating to the same subject matter . . . are to be read and applied together as a single statute[.]"). This analysis is critical because, under the laws of this state, a manufactured home is a mobile home.

The definition given to the term "mobile home" under W. Va.Code § 37–15–2(h) refers to "a transportable structure . . . built *prior to* enactment of the Federal Manufactured Housing Construction and Safety Standards Act of 1974[.]" (Emphasis added). Under this definition, any "mobile home" built *after* 1974 does not fall within the meaning of the definition set forth in the statute.

quirements of this definition except the size requirements and with respect to which the manufacturer voluntarily files a certificate which complies with the applicable federal standards. Calculations used to determine the number of square feet in a structure will be based on the structure's exterior dimensions measured at the largest horizontal projections when erected on site.

**8.** The circuit court made a site visit to the Grafton homes.

**9.** Mobile home is defined in W. Va.Code 37–15–2(h) as follows:

"Mobile home" means a transportable structure that is wholly, or in substantial part, made, fabricated, formed or assembled in manufacturing facilities for installation or assembly and installation on a building site and designed for long-term residential use and built prior to enactment of the Federal Manufactured Housing Construction and Safety Standards Act of 1974 (42 U.S.C. § 5401 et seq.), effective on the fifteenth day of June, one thousand nine hundred seventy-six, and usually built to the voluntary industry standard of the American National Standards Institute (ANSI)—A119.1 Standards for Mobile Homes.

This does not, however, mean that there is no statutory definition for mobile homes built after 1974.

The statutory definition for a "mobile home" constructed after 1974 is incorporated into the definition of a "manufactured home" pursuant to W. Va.Code § 21–9–2(j). Prior to 1974, the construction and safety standards for mobile homes was set by the industry. However, this situation changed with enactment of the Federal Manufactured Housing Construction and Safety Standards Act of 1974. Pursuant to the Act, the federal government established the construction and safety standards for mobile homes. Thereafter, federal law ceased using the term "mobile home." The term "mobile home" was replaced with the term "manufactured home." *See* Historical and Statutory Notes, 42 U.S.C.A. § 5402 (West Supp.1995) ("References to 'mobile homes,' wherever appearing in text, were changed to 'manufactured homes' in view of the amendment of Title VI of the Housing and Community Development Act of 1974 (this chapter) by section 308(c)(4) of Pub.L. 96–399 requiring the substitution of 'manufactured home' for 'mobile home' wherever appearing in Title VI of the Housing and Community Development Act of 1974[.]").

West Virginia recognized that the federal government was referring to mobile homes by using the term "manufactured homes," and therefore adopted that change in terminology.[10] The Legislature did so by repealing the state's Mobile Home Safety Act [11] in 1988, and replacing it with the Manufactured Housing Construction and Safety Standards Act, codified at W. Va.Code § 21–9–1, et seq.[12]

In summation, the federal government began regulating the "mobile home" industry after 1974. When the federal regulatory oversight began, the federal government ceased using the term "mobile home" and replaced it with the term "manufactured home." The West Virginia Legislature followed the name change adopted by the federal government when it enacted the Manufactured Housing Construction and Safety Standards Act in 1988.

■ Based upon the foregoing, we hold that the definition of the term "manufactured home" provided in W. Va.Code § 21–9–2(j) (1992) (Repl.Vol.1996) refers to mobile homes built after the enactment of the Federal Manufactured Housing Construction and Safety Standards Act of 1974. *See* Alvin C. Harrell, *Subprime Lending Developments with Implications for Creditors and Consumers,* 52 Consumer Fin. L.Q. Rep. 238, 247 (1998) ("Most manufactured housing falls into one of four categories: The traditional manufactured home (formerly called mobile homes), built on a chassis to the standards of the Federal Building Code; modular homes, not built on a chassis and subject to local building codes; recreational vehicles (treated as a vehicle rather than a home); and travel trailers, also not subject to manufactured housing rules.").

---

**10.** Except for a few slight differences, West Virginia's statutory definition of manufactured home is identical to that of its federal statutory counterpart. The federal definition found at 42 U.S.C.A. § 5402(6) (West Supp.1995) provides:

"[M]anufactured home" means a structure, transportable in one or more sections, which, in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or, when erected on site, is three hundred twenty or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air-conditioning, and electrical systems contained therein; except that such term shall include any structure which meets all the requirements of this paragraph except the size requirements and with respect to which the manufacturer voluntarily files a certification required by the Secretary and complies with the standards established under this chapter; and except that such term shall not include any self-propelled recreational vehicle.

*See also* 24 C.F.R. § 3280.2 (2001) (providing federal regulatory definition of manufactured home, which contains all the language found in the state's definition).

**11.** The Mobile Home Safety Act was enacted in 1974. *See* 1974 Acts of the Legislature, Regular Session, ch. 58.

**12.** *See* 1988 Acts of the Legislature, Regular Session, ch 70. The state regulations pertaining to manufactured homes may be found at 2 C.S.R. § 42–19–1 *et seq.* (1997).

The parties do not contend that the Grafton homes are mobile homes. Through a lack of understanding of the use of the term "manufactured home," the circuit court ruled that the Grafton homes were manufactured homes. Now that we have clarified the definition of the term "manufactured home," it is obvious that the circuit court erred by concluding that the Grafton homes were manufactured homes. Such a conclusion, in essence, means the Grafton homes are mobile homes. Such a conclusion is wrong. The Grafton homes fall within the statutory definition of a modular home. By its terms, the restrictive covenant to the Sergent property prohibited the erection of modular homes.

Michael Motors asserts that the Douglas family lives in a modular home. Michael Motors also notes that other modular homes exist on the Sergent Lands. The Carrs contend that after these modular homes were built, they executed an agreement, on July 3, 1978, reaffirming the restrictive covenant to the Sergent property. Subsequent to this agreement, the Carrs contend, no other modular homes were permitted. This issue concerns acquiescence in violations of a covenant restriction. This Court addressed the issue of acquiescence in violations of a covenant restriction in syllabus point 2 of *Morris v. Nease*, 160 W.Va. 774, 238 S.E.2d 844 (1977):

> In an action brought to enforce restrictive covenants, acquiescence may be asserted as a defense where the defendant can demonstrate that his covenant violation is not more serious and damaging to the complainants then other violations in the same neighborhood in which the complainants, or their predecessors in title, acquiesced for a protracted period.

■ We are not persuaded by Michael Motor's acquiescence argument as it fails to acknowledge the impact of the July 3, 1978, agreement reaffirming the restrictive covenant to the Sergent property. In this respect, we hold that to show acquiescence in violations of a restrictive covenant where there has been a reaffirmation of the covenant, a party must show that other violations, similar in degree to his or her own, occurred subsequent to any duly recorded reaffirmation of the covenant, and were acquiesced to

by the complainants for a protracted period. Accordingly, Michael Motors must prove that modular homes were erected on the Sergent property *after* the Carrs reaffirmed the covenant in 1978. The record contains no such evidence.

■ Michael Motors further asserts that it provided the circuit court with evidence of the parties' intent when the covenant restriction was inserted in the deed. This Court observed in *Wallace v. St. Clair*, 147 W.Va. 377, 390, 127 S.E.2d 742, 751(1962) that:

> The fundamental rule in construing covenants and restrictive agreements is that the intention of the parties governs. That intention is gathered from the entire instrument by which the restriction is created, the surrounding circumstances and the objects which the covenant is designed to accomplish.

■ Michael Motors provided the circuit court with an affidavit from Jack Butler of Butler Real Estate, one of the parties to the restrictive covenant. Mr. Butler's affidavit indicates that the restrictive covenant was intended to prevent erection of "upgraded" trailers, and not buildings like the Grafton homes. Michael Motors argues that Mr. Double, another party to the restrictive covenant, similarly testified during his deposition that he was concerned about having trailers placed on the property. Mr. Double's deposition further stated that he did not ask to have the term "modular" inserted into the deed.

Several problems are presented by this "intent of the parties" issue. First, the circuit court's summary judgment order does not address the affidavit nor deposition testimony. That is, the circuit court has not indicated that it relied upon this evidence in granting summary judgment. Second, although Michael Motors seeks to use Mr. Double's deposition testimony against the Carrs, Mr. Double is still one of the parties opposed to having the Grafton homes on the Sergent property. Third, because Mr. Double is a plaintiff in this case, the evidence regarding the intent of the parties when making the restrictive covenant establishes a material issue of fact that is in dispute. This

set of factors precluded summary judgment on the issue of the Sergent property.

### C. Summary Judgment on Tort Damage Claims

Finally, the Carrs contend that neither party moved for summary judgment on the claims alleging specific property damage. Nevertheless, the circuit court granted summary judgment to Michael Motors on the tort claims. Michael Motors contends that summary judgment was appropriate because, once the circuit court found that Michael Motors did not violate the covenants in the deeds to the Carpenter and Sergent properties, no liability could be assigned for tort damages.

■ As an initial matter, even if this Court accepted Michael Motors' contention, the circuit court's order of summary judgment on the tort claims does not comply with syllabus point 3 of *Fayette County National Bank v. Lilly*, 199 W.Va. 349, 484 S.E.2d 232 (1997), where we held:

> Although our standard of review for summary judgment remains *de novo*, a circuit court's order granting summary judgment must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed.

In neither the Carpenter property summary judgment order, nor the Sergent property summary judgment order, did the circuit court set out a basis for granting summary judgment on the tort claims.

■ We need not resolve the tort claims issue, based upon our finding of noncompliance with *Lilly*. A more fundamental problem exists. The circuit court was not asked to decide the tort claims issues during the cross motions for summary judgment. Our cases are clear that a circuit court may not grant summary judgment on a claim "without permitting the adverse party a reasonable opportunity to submit pertinent material[.]" *Kopelman & Assocs., L.C. v. Collins*, 196 W.Va. 489, 494, 473 S.E.2d 910, 915 (1996). *See also* Syl. pt. 2, *Gavitt v. Swiger*, 162 W.Va. 238, 248 S.E.2d 849 (1978) ("Ordinarily, in the absence of a written motion for summary judgment by one of the parties, the court is not authorized Sua sponte to grant a summary judgment.").

### IV.

### CONCLUSION

In view of the foregoing, the circuit courts summary judgment orders are reversed and this case is remanded for trial on the merits.

Reversed and Remanded.